866 So.2d 674 (2003)
Howard Steven AULT, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-863.
Supreme Court of Florida.
November 6, 2003.
Rehearing Denied February 4, 2004.
*676 Carey Haughwout, Public Defender, and Richard B. Greene and Jeffrey L. Anderson, Assistant Public Defenders, Fifteenth Judicial Circuit, West Palm Beach, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Melanie Ann Dale, Assistant Attorney *677 General, West Palm Beach, FL, for Appellee.
PER CURIAM.
We have on appeal two convictions of first-degree murder and two sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the convictions but vacate the death sentences and remand for a new penalty phase proceeding before a new jury.

FACTS
Howard Steven Ault was charged with two counts of first-degree murder in the deaths of two young sisters, eleven-year-old Deanne Mu'min and seven-year-old Alicia Jones. Ault was also charged with two counts of sexual battery on a child under twelve years old, two counts of kidnaping a child under thirteen years old, and two counts of aggravated child abuse.
The evidence and testimony presented at trial established the following facts. The two victims were living with their mother Donna Jones and their two-year-old sister in a pop-up trailer attached to the family car. When the mother could afford the camping fee, the family would camp at John Easterlin County Park in Broward County. The family had been camping at the park on and off for many months. Ault met the family at Easterlin Park a few days before the girls disappeared. He offered to let the family shower at his house, and gave Jones a hand-drawn map to his house. Ault also gave the two sisters a ride in his truck the same day and their mother scolded them for getting in his truck. A few days before the two sisters disappeared, a witness saw Ault talking to the girls and buying them snacks at a convenience store which the girls passed on their way home from school.
On Monday, November 4, 1996, the two girls left school at 2:05 p.m. Witnesses saw the girls walking home, but the girls never arrived at the park. Their mother looked for them at school and eventually went to Ault's house later in the evening. Ault stated that he had not seen the girls and asked the mother not to call the police as he had some problems with the police in the past. The mother went to her cousin's house and called the police. The police went to Ault's apartment and asked whether he had seen the girls. Ault stated that he had not seen the girls and allowed the officers to look around his apartment.
Ault and his wife voluntarily agreed to come to the Oakland Park Police Department to give sworn statements the next day. Detective William Rhodes, the lead officer on the case, interviewed Ault and his wife at the police department. Ault stated that he had only met the girls once a few days earlier in Easterlin Park, and that the girls had never been in his truck. Shortly after this interview, Officer Deborah Cox of the Broward County Sheriff's Department arrested Ault on an unrelated charge of attempted sexual battery of a minor that had occurred eleven months earlier. Ault was taken to the Broward County jail. In the meantime, Rhodes located witnesses who had seen the girls in Ault's truck, had seen Ault with the girls on several occasions, and had seen Ault and his vehicle at the convenience store at the approximate time that the girls were walking home from school on the day they disappeared, all of which contradicted Ault's voluntary statement.
The next day, Rhodes visited Ault at the Broward County jail and explained that his investigation of the girls' disappearance indicated that Ault had lied at the initial interview. When Ault indicated his desire to speak to Rhodes, Rhodes read Ault his *678 Miranda[1] rights and Ault waived these rights. Ault confessed that he had killed the girls within an hour after he had taken them to his apartment. Ault agreed to show Rhodes where the bodies were. Ault led the police to his apartment, confessed that the girls were in the attic, and explained that the officers who had looked around the night before had not looked in the attic. Ault signed a consent-to-search form and the police found the girls' bodies in the attic as Ault had stated.
Ault was taken to the Oakland Park Police Department and insisted that he would only speak to Rhodes. Ault then gave a taped confession in which he revealed the following details. Ault planned to sexually assault the girls when he met them in front of the convenience store about 2:30 p.m. on November 4, 1996. He offered the girls a ride, and lured them to his house with the promise of candy. He sexually assaulted eleven-year-old Deanne with his finger and also penetrated her with his penis. When Deanne started to scream and fight, Ault strangled her until she stopped screaming. He then strangled seven-year-old Alicia to keep her from telling anyone about the incident, but he did not sexually assault her. Ault redressed Deanne and put the bodies of both girls in his attic. Ault said that he killed the girls because he was afraid they would tell someone what he had done. Because he was already on community control for sexual assault on a child under twelve years of age, he feared that he would go to jail for at least twenty-five years. He also stated that he thought about the trauma his wife had experienced when he was previously arrested and did not want to put her through that trauma again.
The medical examiner testified that both girls died from manual strangulation, that there was bruising and hemorrhaging of Deanne's vaginal tissue, that Deanne had been dead for approximately two days when her body was found, and that, based on the decomposition of her body, Alicia had died twelve to eighteen hours after Deanne. Based on the lesser state of decomposition of Alicia's body and a white foamy substance coming from her mouth, the medical examiner stated that Alicia appeared to have been alive, albeit comatose, at the time she was placed in the attic.
The defense rested without presenting any evidence, except for two documents: Ault's notice to invoke his rights to counsel and to remain silent in the unrelated attempted sexual battery case, and the court order acknowledging that invocation of rights. The jury found Ault guilty on all charges. At the request of defense counsel, the penalty phase proceeding was scheduled approximately six weeks after the guilt phase concluded.
After the presentation of penalty phase evidence and testimony by witnesses for both the State and the defense, the jury recommended death on both counts of murder by a nine-to-three vote. The trial judge followed the jury's recommendation and imposed two death sentences. The judge found six aggravating circumstances: Ault was previously convicted of a felony and placed on community control (great weight); Ault was previously convicted of a violent felony (great weight); the murders were committed while Ault was engaged in sexual battery, aggravated child abuse, and kidnapping (great weight); the murders were committed to avoid arrest (full weight); the murders were heinous, atrocious, or cruel (great weight); the victims were less than twelve years of age (great weight). The court found no statutory mitigators and six nonstatutory *679 mitigators: family relations and troubled childhood (little weight); prenatal care (little, if any, weight); sexual and physical abuse (some weight); organic brain damage (little weight); pedophilia and compulsive mental disorder (some weight); and remorse (some weight).[2] The trial court concluded that the aggravating factors far outweighed the mitigating factors and that the circumstances of the case and Ault's history placed the case in the category of the most aggravated and least mitigated of first-degree murders. Thus, the court sentenced Ault to death for both murders.
Ault appeals his convictions and sentences to this Court, raising nine issues on appeal. Ault contends that: (1) the trial court erred in denying his motion to suppress his statements to the police; (2) the trial court erred in granting the State's challenge for cause of juror Reynolds; (3) the trial court erred in denying his motion for a penalty phase mistrial based on the prosecutor's questioning of witnesses about collateral crimes; (4) the trial court erred by not allowing a defense expert to express his opinion as to the applicability of a statutory mental mitigating factor; (5) the trial court erred in permitting two penalty phase witnesses to testify about hearsay evidence; (6) the trial court erred in denying his request to discharge penalty phase counsel; (7) the aggravating circumstance that the murder was committed in the course of a specified felony is unconstitutional; (8) his death sentence violates the principles announced in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and (9) the trial court erred in sentencing him under the 1995 sentencing guidelines for the noncapital offenses and in imposing a departure sentence without contemporaneous written reasons for the departure. The State addresses one issue relating to this Court's proportionality review of the death sentences on appeal. The State contends that Ault's two death sentences are proportional in light of the six aggravating factors, no statutory mitigating factors, and the weak nonstatutory mitigating factors.

GUILT PHASE
Ault raises only one guilt phase issue. He argues that the trial court erred in denying his motion to suppress the statements that he made to Detective Rhodes following his arrest on the unrelated attempted sexual battery charge. After Ault was arrested on the unrelated charge, he was transported to the Broward County jail. Ault also signed a form invoking his right to counsel and right to remain silent on this unrelated charge. At Ault's hearing the day after his arrest on the unrelated sexual battery charge, the magistrate found probable cause for the arrest and, in light of Ault's invocation of his rights, issued an order in this unrelated case prohibiting police officers from speaking to Ault without his attorney. After the magistrate issued this order, Rhodes visited Ault at the Broward County jail to ask him about the contradictory information that other witnesses had revealed in this case. Ault admitted that he had lied in his earlier voluntary statement, confessed that he had killed the girls, and offered to show the location of the bodies. After the bodies were located, Ault gave another statement revealing details of the crimes.
Ault filed a motion to suppress all of his statements. The trial court held an evidentiary hearing on this motion to suppress and heard argument from both sides. Ault's attorney argued that the statements *680 should be suppressed on three grounds: (1) the probable cause for Ault's arrest on attempted sexual battery was stale eleven months after the incident and thus Officer Cox did not have probable cause to arrest him on that charge and any evidence derived from that illegal arrest should be suppressed; (2) the arrest for attempted sexual battery was pretextual in order to place Ault in custody so that the police could question him about the two missing girls and thus the arrest was illegal; and (3) Ault had invoked his Fifth and Sixth Amendment rights to counsel in open court and Detective Rhodes violated these rights by talking to him without counsel being present.
The witnesses at the evidentiary hearing included Detective Rhodes, Officer Cox of the Broward Sheriff's Office, who arrested Ault for the unrelated attempted sexual battery of a minor that had occurred eleven months earlier, and a Florida Department of Law Enforcement agent who assisted the Oakland Park Police Department with the investigation.
Rhodes testified that Ault and his wife voluntarily came to the Oakland Park Police Department and gave sworn statements on November 5, 1996. In his statement, Ault stated that he had only seen the girls once and that they had never been in his vehicle. After Rhodes took Ault's voluntary statement, Rhodes interviewed other witnesses who contradicted Ault as these witnesses had seen the girls with Ault on various dates and had also seen the girls in his truck. Both Rhodes and Cox testified that there was no discussion between their offices about their respective cases.
Officer Cox testified that her husband, an officer at the Oakland Park Police Department, called her when he recognized Ault's name as the suspect in her open case of attempted sexual battery. Cox testified that she did not discuss this with any other Oakland Park officers, nor did she discuss her decision to arrest Ault. Cox stated that she told Ault about the allegation against him; Ault denied any knowledge of the allegation and refused to speak to her. Cox also testified that she placed Ault under arrest for the December 1995 attempted sexual battery and that at the hearing the next day, the magistrate found probable cause for the arrest on the unrelated attempted sexual battery. It was also revealed at the evidentiary hearing that Officer Cox had been fired from the Broward Sheriff's Office based on the delay between the victim's February 1996 statement about the attempted sexual battery and the officer's November 1996 contact with Ault. However, Officer Cox also testified that she was being reinstated to the Broward Sheriff's Office after arbitration.
Rhodes testified that he was not aware that Cox had arrested Ault on this unrelated charge until Ault had already been placed in a holding cell. Based on the contradictory information he learned from other witnesses, Rhodes decided to talk to Ault at the Broward jail the day after his arrest. Rhodes testified that he did not know that Ault had attended a magistrate hearing or had signed a rights invocation form on the other charge when he talked to Ault at the Broward jail. Rhodes read Ault his Miranda rights before talking to him; Ault waived his rights and signed a waiver form. During the initial untaped conversation, Ault admitted that he killed the girls and offered to take Rhodes to their bodies and to provide a taped statement afterwards. Ault led the officers to his apartment, indicated that the bodies were in the attic, and signed a consent to search form. After the bodies were found, Ault was taken to the Oakland Park Police *681 Department where he gave a videotaped statement detailing the crimes.
At the suppression hearing, the judge ruled that the probable cause to arrest Ault on the unrelated attempted sexual battery was not "stale" just because it was based on a statement by the victim and her father taken nine months earlier, and that the uncontested testimony of the officers showed that the arrest for the attempted sexual battery was not pretextual. The judge asked the parties to provide supplemental memoranda on the third issue: whether Ault's invocation of his right to remain silent and right to counsel in regard to the 1995 attempted sexual battery rendered Rhodes' interview and Ault's subsequent statements inadmissible. After reviewing the memoranda and the transcript of Ault's confession, the judge also denied the motion to suppress on this basis. The judge relied upon this Court's decision in Sapp v. State, 690 So.2d 581 (Fla.1997).
In Sapp, this Court concluded that a defendant may only invoke his Fifth Amendment right to counsel when two requirements are met: the defendant is in a custodial setting and there is an official interrogation. 690 So.2d at 585. Sapp had been arrested for a robbery, advised of his Miranda rights, waived them, and agreed to speak to the police. After his arrest, he met with his public defender in a holding room and signed a claim of rights form in which he invoked both his Fifth and Sixth Amendment rights to counsel and to remain silent. One week later, while Sapp was still in jail on the robbery charge, he was taken to the homicide office and questioned about a different robbery-homicide. Sapp was again advised of his rights, waived them in writing, talked to the police without requesting an attorney, and signed a written statement. Twelve hours later Sapp was approached by the police again. At this encounter, Sapp signed a second waiver form, agreed to talk to a detective, and signed a second written statement. Sapp's motion to suppress his statements was denied by the trial court and he was convicted of attempted armed robbery and first-degree felony murder. On appeal, the First District Court of Appeal held that Sapp's attempt to invoke his Fifth Amendment right to counsel through the claim of rights form was not effective because custodial interrogation had not begun and was not imminent when he signed the form. See Sapp v. State, 660 So.2d 1146 (Fla. 1st DCA 1995), approved, 690 So.2d 581 (Fla. 1997).
This Court reviewed the district court's decision in Sapp on the basis of a certified question asking whether a person in custody can invoke his Fifth Amendment right to counsel under Miranda by signing a claim-of-rights form shortly before the first appearance hearing, even though interrogation is not imminent. 690 So.2d at 583. In addressing the certified question, this Court cited to McNeil v. Wisconsin, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), which held that an accused's request for counsel at the initial appearance on a charged offense, while effective to invoke the Sixth Amendment right to counsel, did not constitute an invocation of the Fifth Amendment right to counsel under Miranda that would preclude police interrogation on unrelated, uncharged offenses. This Court also noted that at least three federal appellate courts have concluded that, based on McNeil, an individual may not invoke the Miranda right to counsel before custodial interrogation has begun or is imminent.[3]Sapp, 690 So.2d at *682 585. Based on these cases, this Court concluded that the presence of both a custodial setting and official interrogation is required to trigger the Fifth Amendment right-to-counsel under Miranda and the parallel provision in article I, section 9 of the Florida Constitution. Id. at 585-86. Under Sapp, a defendant may not properly invoke this right to counsel through a claims form which has been executed "`removed from the strictures of custodial interrogation feared by the Miranda court.'" Id. at 585 (quoting Alston v. Redman, 34 F.3d 1237, 1245 (3rd Cir. 1994)). Accordingly, this Court answered the certified question in the negative and approved the decision of the First District in Sapp. Id. at 586.
In Sapp, this Court also disapproved the decision of the Second District Court of Appeal in State v. Guthrie, 666 So.2d 562 (Fla. 2d DCA 1995), quashed, 692 So.2d 888 (Fla.1997), which was in conflict with the Court's decision in Sapp. 690 So.2d at 586. In Guthrie, the Second District held that a defendant's claim-of-rights form signed at a first appearance hearing on a grand theft charge precluded the police from questioning the defendant on unrelated allegations of sexual child abuse. The circuit court had suppressed Guthrie's confession to the child abuse charges and the district court affirmed the ruling because it concluded that the "invocation of the constitutional right to counsel bars uncounseled interrogation during continuous custody unless initiated by the defendant." 666 So.2d at 562.
Ault argues that Sapp is distinguishable from his case because Sapp's interrogation on the second unrelated charge occurred one week after Sapp had been arrested on the charge in which he invoked his rights. However, the time frame in Guthrie is remarkably similar to the instant case. Guthrie was arrested on the grand theft charges at 12:30 a.m., taken to first appearance at 8 a.m. and invoked his rights, and questioned by the police on the unrelated charge approximately seven hours later. Further, it is clear from the analysis in Sapp that this Court was not concerned with the time between the invocation of rights and the questioning on the unrelated charge. Rather, it is custodial interrogation that triggers the Miranda prophylactic. As this Court explained in Sapp, "requiring the invocation [of the right to counsel] to occur either during custodial interrogation or when it is imminent strikes a healthier balance between the protection of the individual from police coercion on the one hand and the State's need to conduct criminal investigations on the other." 690 So.2d at 586. As we stated in Traylor v. State, 596 So.2d 957, 965 (Fla.1992), "We adhere to the principle that the state's authority to obtain freely given confessions is not an evil, but an unqualified good." Accord Hess v. State, 794 So.2d 1249, 1259-61 (Fla.2001).
Here, Ault invoked his rights at the magistrate hearing on the unrelated charge. Although Ault was in custody on this unrelated charge at the time he invoked his rights, he was not being interrogated, and no interrogation was imminent on the case involving the disappearance of the girls. See Rhode Island v. Innis, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ("[T]he special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."). Prior to his arrest on the unrelated attempted sexual battery charge, Ault had voluntarily given a statement about the missing girls to Detective Rhodes and was *683 free to leave the Oakland Park Police Department. After this voluntary encounter concluded, Ault was arrested by an officer from the Broward County Sheriff's Department on the unrelated charge. It was only after Detective Rhodes' discussions with other witnesses, which occurred after Ault's arrest on the unrelated charge, revealed information that contradicted Ault's previous voluntary statement that the police found it necessary to again question Ault about the girls' disappearance. Having already made a statement to the police concerning the girls' disappearance, Ault had no objective reason to believe further questioning on that case was imminent.
Thus, Ault's invocation of rights at the magistrate hearing only precluded the police from questioning Ault about the attempted sexual battery charge, not the unrelated murders. Accordingly, we affirm the trial court's ruling on the motion to suppress. Ault's confession to the murders of the two sisters and the other crimes was properly admitted.
While Ault raises no claim relating to the sufficiency of the evidence to support his convictions, we have reviewed the evidence and find sufficient evidence to support his convictions. See Sexton v. State, 775 So.2d 923, 933 (Fla.2000) ("[I]t is this Court's independent obligation to review the record for sufficiency of evidence."); Fla. R.App. P. 9.140(i). Accordingly, we affirm Ault's convictions for first-degree murder, sexual battery on a child under twelve years old, kidnapping a child under thirteen years old, and aggravated child abuse.

PENALTY PHASE
While Ault raises a number of claims relating to the penalty phase of his trial, we find his claim relating to the dismissal of a potential juror to be dispositive and to require a new penalty phase proceeding before a new jury.
Ault claims that the trial court erroneously granted the State's challenge for cause of potential juror Joyce Reynolds. The State challenged Reynolds based on her opposition to the death penalty, arguing that Reynolds had stated that she could not make a recommendation of death even if the aggravating circumstances outweighed the mitigating circumstances. Defense counsel responded that Reynolds had stated that she would follow the court's instructions on the law in both the penalty and guilt phase and thus had been rehabilitated. The circuit court granted the State's cause challenge. Defense counsel objected and requested an opportunity to further question Reynolds in order to rehabilitate her. The circuit court denied the request, stating that there had been adequate inquiry by both sides. Defense counsel renewed the objection to Reynolds' removal for cause prior to the jury being sworn. Thus, the issue was properly preserved for review on appeal and Ault did not waive his objection to the cause challenge. See Arnold v. State, 755 So.2d 696, 698 (Fla. 4th DCA 1999) (explaining that in order to prevent waiver of juror challenge issue, opponent must call court's attention to its earlier objection before jury is sworn).
The test for determining juror competency is whether a juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court. See Lusk v. State, 446 So.2d 1038, 1041 (Fla.1984). A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind. See Bryant v. State, 656 So.2d 426, 428 (Fla.1995). "In reviewing a claim of error such as this, we have recognized that the trial court has a *684 unique vantage point in the determination of juror bias. The trial court is able to see the jurors' voir dire responses and make observations which simply cannot be discerned from an appellate record." Smith v. State, 699 So.2d 629, 635-36 (Fla.1997); see also Taylor v. State, 638 So.2d 30, 32 (Fla.1994). Thus, a trial court has great discretion when deciding whether a challenge for cause based on juror incompetency is proper. See Pentecost v. State, 545 So.2d 861 (Fla.1989). A trial court's determination of juror competency will not be overturned absent manifest error. See Kimbrough v. State, 700 So.2d 634, 639 (Fla.1997).
However, prospective jurors may not be excused for cause simply because they voice general objections to the death penalty. See Witherspoon v. Illinois, 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The relevant inquiry in deciding whether prospective jurors may be excluded for cause based on their views on capital punishment is "whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with [the court's] instructions and [the juror's] oath.'" Gray v. Mississippi, 481 U.S. 648, 658, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987) (quoting Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)).
While we give deference to the trial judge who sees and hears the juror and often has to make credibility findings based on information that cannot be easily discerned from an appellate record, Witt, 469 U.S. at 429, 105 S.Ct. 844, the record in the instant case directly contradicts the judge's ruling. During voir dire questioning by the State, Reynolds raised her hand to indicate her opposition to the death penalty.[4] In response to questioning by defense counsel, Reynolds expressed her belief that a juror would make a better decision when calm and deliberate rather than when upset and angry,[5] that just because she heard testimony from a witness it was not the same as proof beyond a reasonable doubt because the witness could be lying,[6] expressed some concern *685 about how her experiences with death in her personal life might affect her ability to find guilt or innocence or impose a proper penalty,[7] stated that she could put her personal feelings aside and be fair in the penalty phase,[8] and stated that she could be fair in both the guilt and penalty phases even though she was personally opposed to the death penalty.[9] These are the only instances where Reynolds was personally questioned during voir dire. The State argued that Reynolds had indicated that she could not consider both sentences and would not impose death even if the aggravating circumstances outweighed the mitigating circumstances. The trial judge granted the challenge for cause and voiced his "agree[ment] with the State."[10] However, the record of Reynolds' responses directly contradicts the State's recitation of her responses. Reynolds did not state that she could not consider both sentences and would not impose death even if the aggravating circumstances outweighed the mitigating. In fact, the voir dire record shows that Reynolds was not questioned about these issues at all. Thus, the trial judge's determination that it was proper to strike Reynolds for cause was premised on an erroneous recitation of her statements.
We conclude that Reynolds' responses, i.e., that she could put her personal feelings aside and be fair in the penalty phase and that she could be fair in the guilt and penalty phases even though she opposed *686 the death penalty, satisfied the Lusk juror competency standard. Thus, the circuit court erred in granting the State's challenge for cause.
The State argues that even if Reynolds was erroneously removed for cause, the error was harmless as the State had two peremptory challenges left at the end of voir dire questioning and could have used one of these to strike Reynolds. We conclude that such error is not subject to harmless error analysis. See Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987); Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976); Farina v. State, 680 So.2d 392, 396 (Fla.1996). As the United States Supreme Court explained in Gray,
The unexercised peremptory argument assumes that the crucial question in the harmless-error analysis is whether a particular prospective juror is excluded from the jury due to the trial court's erroneous ruling. Rather, the relevant inquiry is "whether the composition of the jury panel as a whole could possibly have been affected by the trial court's error."
481 U.S. at 664-65, 107 S.Ct. 2045 (quoting Moore v. Estelle, 670 F.2d 56, 58 (5th Cir.1982) (Goldberg, J., specially concurring)). In a capital case it is reversible error to exclude for cause a juror who can follow the instructions and oath in regard to the death penalty. "The nature of the jury selection process defies any attempt to establish that an erroneous Witherspoon-Witt exclusion of a juror is harmless." Id. at 665. However, only the death sentenceand not the conviction must be vacated when a juror is erroneously excluded under these circumstances. See Farina, 680 So.2d at 396 n. 3; Chandler v. State, 442 So.2d 171, 175 (Fla.1983). Thus, we conclude that the erroneous exclusion of this "scrupled, yet eligible, venire member" from Ault's jury requires reversal of his death sentences. Gray, 481 U.S. at 667, 107 S.Ct. 2045.
Although the juror challenge issue is dispositive, we address one other penalty phase claim raised by Ault for purposes of instruction during the new penalty phase proceeding.[11]
Ault argues that the aggravating circumstance that the murder was committed in the course of committing a specified felony is unconstitutional because it constitutes an automatic aggravator and does not narrow the class of persons eligible for the death penalty. This Court has repeatedly found the murder in the course of a felony aggravator to be constitutional. See Hitchcock v. State, 755 So.2d 638, 644 (Fla.2000); Blanco v. State, 706 So.2d 7, 11 (Fla.1997) (containing citation to numerous cases in which this Court has upheld and applied the murder in the course of a felony aggravator); Banks v. State, 700 So.2d 363, 367 (Fla.1997); Mills v. State, 476 So.2d 172, 178 (Fla.1985) (rejecting argument that murder in the course of a felony aggravator creates automatic aggravating circumstance for all felony-murder cases because Legislature has reasonably determined that first-degree murder committed in course of another dangerous felony is aggravated capital felony). This Court has also rejected constitutional challenges to the murder in the course of a felony aggravator based on equal protection, due process, and cruel and unusual punishment. See, e.g., Clark v. State, 443 So.2d 973, 978 (Fla.1983); Menendez v. State, 419 So.2d 312, 314-15 (Fla.1982). Thus, there is no merit to this claim.

*687 SENTENCING ON NONCAPITAL OFFENSES

Ault was also convicted of two counts of kidnapping a child under thirteen years old and two counts of aggravated child abuse.[12] Ault was sentenced under the 1995 sentencing guidelines for these noncapital offenses. He was sentenced to 511 months on each of the kidnapping counts and 360 months on each of the aggravated child abuse counts. The trial court made these sentences consecutive to each other and to Ault's other sentences.
Ault claims that the sentences for the noncapital offenses are illegal because he was sentenced under the 1995 guidelines, which this Court ruled unconstitutional in Heggs v. State, 759 So.2d 620 (Fla.2000); the trial court imposed a departure sentence without offering contemporaneous written reasons for the departure; and the consecutive sentences resulted in a departure from the guidelines range. The State agrees that the case must be remanded for resentencing on these noncapital offenses.
This Court has held that it is reversible error for a court to give a departure sentence without offering contemporaneous written reasons for the departure. See Robertson v. State, 611 So.2d 1228, 1234 (Fla.1993) (concluding that trial court erred in imposing consecutive life sentences for noncapital felonies of armed robbery and armed burglary where the court did not provide written reasons for the sentencing departure); see also § 921.001(6), Fla. Stat. (1995) ("Any sentence imposed outside the range recommended by the guidelines must be explained in writing by the trial court judge."). In the instant case, the State concedes that the consecutive nature of the sentences for the noncapital offenses resulted in a total sentence which exceeded the top of the guidelines range. This is permissible where the court provides valid written reasons for the departure. While the State filed a motion asking the circuit court to depart from the recommended guidelines sentence on Ault's noncapital felonies and to impose the sentences consecutive to each other, the court denied that motion and ordered the State to prepare a sentencing guidelines score sheet for the noncapital offenses. The court gave no reason for its decision to impose the consecutive sentences, which constituted a departure from the guidelines range.
Ault was sentenced under the 1995 sentencing guidelines. In Heggs, this Court struck down the 1995 guidelines because they were enacted by legislation that violated the single subject rule contained in article III, section 6 of the Florida Constitution. Individuals, such as Ault, who were sentenced under the invalidated 1995 guidelines and who fall into the Heggs window[13] are entitled to have their sentences recalculated under the 1994 guidelines. Normally, when a trial judge fails to provide written reasons for a sentence that departs from the guidelines, the reviewing court must reverse with instructions to resentence the defendant in accordance with the sentencing guidelines without possibility of departure. See Donaldson v. State, 722 So.2d 177, 189 (Fla.1998). However, as this Court explained *688 in Heggs, "in the sentencing guidelines context, ... if a person's sentence imposed under the 1995 guidelines could have been imposed under the 1994 guidelines (without a departure), then that person shall not be entitled to relief under our decision here." 759 So.2d at 627; see also Smith v. State, 761 So.2d 419, 422 (Fla. 2d DCA 2000).
If the sentences imposed for these noncapital offenses could not have been lawfully imposed under the 1994 sentencing guidelines, then Ault must be resentenced in accordance with those guidelines without departure. Thus, we remand this case to the circuit court for resentencing under the 1994 sentencing guidelines on Counts 5-8.

Conclusion
For the reasons discussed above, we affirm Ault's convictions but vacate his death sentences and remand for a new penalty phase proceeding before a new jury. We also remand for resentencing under the 1994 sentencing guidelines on the noncapital offenses.
It is so ordered.
ANSTEAD, C.J., and WELLS, PARIENTE, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The circuit court grouped the seventy-one nonstatutory mitigators proposed by Ault into these six categories.
[3] See United States v. LaGrone, 43 F.3d 332 (7th Cir.1994); Alston v. Redman, 34 F.3d 1237 (3rd Cir.1994); United States v. Wright, 962 F.2d 953 (9th Cir.1992).
[4] The voir dire record does not contain any other questioning of Reynolds by the State.
[5] During voir dire questioning by the defense, the following inquiry took place:

Mr. Kulik [defense counsel]: Ms. Reynolds, do you think that a person's decision, any person, do you think their decision is better when they are angry or upset or when they are calm and deliberate?
Ms. Reynolds: I think their decision is better when they are calmer.
Mr. Kulik: If you were a juror on a case, and there is something about the case that was upsetting to you, made you angry early do you think that you would be able to make a better decision if, after getting angry and upset you could become calmer and more deliberate about it?
Ms. Reynolds: Yes, I could.
[6] During voir dire questioning by the defense, the following inquiry took place:

Mr. Kulik: Okay. You will hear the testimony of a witness which you believe the witness, is it the same as proof beyond a reasonable doubt?
. . . .
Mr. Kulik: Ms. Reynolds is shaking her head no. Why would you say no?
Ms. Reynolds: Can you repeat the question?
Mr. Kulik: Have you had a situation in which you believe people
Ms. Reynolds: Yes.
Mr. Kulik:but what they told you later turned out not to be accurate, they could be wrong, they could be lying to you?
Ms. Reynolds: Yes.
Mr. Kulik: Maybe you didn't understand what they said. It was misleading somewhat so I will ask you again. Do you think that believing a witness is the same thing [as] allegation [of] proof beyond a reasonable doubt?
Ms. Reynolds: What they were saying, no that is the same guy that was pointed out when, in fact, it was incorrect.
[7] Defense counsel Smith asked the entire venire, "I want you to tell us how any experience [with] death in your life might effect you with finding either guilt or innocence or a proper penalty while being fair and impartial to Mr. Ault, how any death might effect your life.... [H]ow many aren't sure how it will effect you?" Reynolds raised her hand in response.
[8] During voir dire questioning by the defense, the following inquiry took place:

Ms. Smith [defense counsel]: [I]f you find Steve guilty of these crimes, all of these crimes, if you can put aside feelings that you have, legitimate feelings and be fair and impartial now is the time to come clean.
. . . .
Ms. Smith: Ms. Reynolds?
Ms. Reynolds: Yes, I would put my feelings aside.
[9] During voir dire questioning by the defense, the following inquiry took place:

Ms. Smith: Ms. Reynolds, I believe you said that you oppose the death penalty?
Ms. Reynolds: Yes, I do.
Ms. Smith: After everything has been discussed in this room, in this courtroom, and you understand that you are in opposition and your feelings about the death penalty are important to you, but not in this process, are you a juror who can be fair and impartial in the guilt phase and the penalty phase of this trial?
Ms. Reynolds: Yes, I can.
[10] The following discussion took place during the State's motion to strike juror Reynolds for cause:

Mr. Donnelly [prosecuting attorney]: The State would move to strike juror number twenty-seven, Joyce Reynolds for cause. Ms. Reynolds indicated that she is opposed to the death penalty and that she could not consider both sentences and cannot make a recommendation of death even if the aggravating circumstances outweigh the mitigating circumstances.
The Court: Defense.
Mr. Kulik: I would submit that Ms. Reynolds is in the same category as Mrs. Aaron. At the end she did state she would follow the court's instructions on the law in both the penalty phase and the guilt phase of the trial. She was therefore rehabilitated.
The Court: Without any reference to Mrs. Aaron, I agree with the State, I will grant that one.
Mr. Kulik: We object.
The Court: So noted.
Ms. Smith: Your Honor, I would again ask that we be able to bring her back in if the State is going to strike her for cause so that we could attempt to rehabilitate her.
The Court: I am not going to allow that. I believe there was adequate inquiry extensively on both sides.
[11] We conclude that our resolution of the juror challenge issue renders claims 3, 4, 5, 6, and 8 and the State's proportionality claim moot.
[12] Ault was also convicted of two counts of sexual battery on a child under twelve years of age, which is a capital felony under section 794.011(2)(a), Florida Statutes (1995). He was sentenced to life imprisonment without the possibility of parole, as provided in section 775.082(1), Florida Statutes (1995).
[13] See Trapp v. State, 760 So.2d 924, 928 (Fla.2000) (stating that defendants have standing to challenge a sentence imposed under the guidelines struck down in Heggs if the relevant criminal offense or offenses occurred on or after October 1, 1995, and before May 24, 1997).