# Supreme Court of Florida

_____

No. SC14-1551
_____

**HOWARD STEVEN AULT,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[March 9, 2017]

PER CURIAM.

Howard Steven Ault, a prisoner under sentence of death, appeals from an order denying a motion to vacate convictions for first-degree murder and sentences of death under Florida Rule of Criminal Procedure 3.851.  Because the order concerns postconviction relief from a capital conviction for which a sentence of death was imposed, this Court has jurisdiction of the appeal under article V, section 3(b)(1), Florida Constitution.  For the reasons that follow, we affirm the postconviction court's denial of postconviction relief on Ault's guilt phase claims and do not address his penalty phase claims because Ault is entitled to a new penalty phase under Hurst v. Florida, 136 S. Ct. 616 (2016).

# FACTS AND PROCEDURAL HISTORY

The facts of this case were set forth in Ault's first direct appeal:

Howard Steven Ault was charged with two counts of first-degree murder in the deaths of two young sisters, eleven-year-old Deanne Mu'min and seven-year-old Alicia Jones. Ault was also charged with two counts of sexual battery on a child under twelve years old, two counts of kidnaping a child under thirteen years old, and two counts of aggravated child abuse.

The evidence and testimony presented at trial established the following facts. The two victims were living with their mother Donna Jones and their two-year-old sister in a pop-up trailer attached to the family car. When the mother could afford the camping fee, the family would camp at John Easterlin County Park in Broward County. The family had been camping at the park on and off for many months. Ault met the family at Easterlin Park a few days before the girls disappeared. He offered to let the family shower at his house, and gave Jones a hand-drawn map to his house. Ault also gave the two sisters a ride in his truck the same day and their mother scolded them for getting in his truck. A few days before the two sisters disappeared, a witness saw Ault talking to the girls and buying them snacks at a convenience store which the girls passed on their way home from school.

On Monday, November 4, 1996, the two girls left school at 2:05 p.m. Witnesses saw the girls walking home, but the girls never arrived at the park. Their mother looked for them at school and eventually went to Ault's house later in the evening. Ault stated that he had not seen the girls and asked the mother not to call the police as he had some problems with the police in the past. The mother went to her cousin's house and called the police. The police went to Ault's apartment and asked whether he had seen the girls. Ault stated that he had not seen the girls and allowed the officers to look around his apartment.

Ault and his wife voluntarily agreed to come to the Oakland Park Police Department to give sworn statements the next day. Detective William Rhodes, the lead officer on the case, interviewed Ault and his wife at the police department. Ault stated that he had only met the girls once a few days earlier in Easterlin Park, and that the girls had never been in his truck. Shortly after this interview,

Officer Deborah Cox of the Broward County Sheriff's Department arrested Ault on an unrelated charge of attempted sexual battery of a minor that had occurred eleven months earlier. Ault was taken to the Broward County jail. In the meantime, Rhodes located witnesses who had seen the girls in Ault's truck, had seen Ault with the girls on several occasions, and had seen Ault and his vehicle at the convenience store at the approximate time that the girls were walking home from school on the day they disappeared, all of which contradicted Ault's voluntary statement.

The next day, Rhodes visited Ault at the Broward County jail and explained that his investigation of the girls' disappearance indicated that Ault had lied at the initial interview. When Ault indicated his desire to speak to Rhodes, Rhodes read Ault his Miranda[1] rights and Ault waived these rights. Ault confessed that he had killed the girls within an hour after he had taken them to his apartment. Ault agreed to show Rhodes where the bodies were. Ault led the police to his apartment, confessed that the girls were in the attic, and explained that the officers who had looked around the night before had not looked in the attic. Ault signed a consent-to-search form and the police found the girls' bodies in the attic as Ault had stated.

Ault was taken to the Oakland Park Police Department and insisted that he would only speak to Rhodes. Ault then gave a taped confession in which he revealed the following details. Ault planned to sexually assault the girls when he met them in front of the convenience store about 2:30 p.m. on November 4, 1996. He offered the girls a ride, and lured them to his house with the promise of candy. He sexually assaulted eleven-year-old Deanne with his finger and also penetrated her with his penis. When Deanne started to scream and fight, Ault strangled her until she stopped screaming. He then strangled seven-year-old Alicia to keep her from telling anyone about the incident, but he did not sexually assault her. Ault redressed Deanne and put the bodies of both girls in his attic. Ault said that he killed the girls because he was afraid they would tell someone what he had done. Because he was already on community control for sexual assault on a child under twelve years of age, he feared that he would go to jail for at least twenty-five years. He also stated that he thought

---

1. Miranda v. Arizona, 384 U.S. 86 (1966).

about the trauma his wife had experienced when he was previously arrested and did not want to put her through that trauma again.

The medical examiner testified that both girls died from manual strangulation, that there was bruising and hemorrhaging of Deanne's vaginal tissue, that Deanne had been dead for approximately two days when her body was found, and that, based on the decomposition of her body, Alicia had died twelve to eighteen hours after Deanne. Based on the lesser state of decomposition of Alicia's body and a white foamy substance coming from her mouth, the medical examiner stated that Alicia appeared to have been alive, albeit comatose, at the time she was placed in the attic.

The defense rested without presenting any evidence, except for two documents: Ault's notice to invoke his rights to counsel and to remain silent in the unrelated attempted sexual battery case, and the court order acknowledging that invocation of rights. The jury found Ault guilty on all charges. At the request of defense counsel, the penalty phase proceeding was scheduled approximately six weeks after the guilt phase concluded.

After the presentation of penalty phase evidence and testimony by witnesses for both the State and the defense, the jury recommended death on both counts of murder by a nine-to-three vote. The trial judge followed the jury's recommendation and imposed two death sentences. The judge found six aggravating circumstances: Ault was previously convicted of a felony and placed on community control (great weight); Ault was previously convicted of a violent felony (great weight); the murders were committed while Ault was engaged in sexual battery, aggravated child abuse, and kidnapping (great weight); the murders were committed to avoid arrest (full weight); the murders were heinous, atrocious, or cruel (great weight); the victims were less than twelve years of age (great weight). The court found no statutory mitigators and six nonstatutory mitigators: family relations and troubled childhood (little weight); prenatal care (little, if any, weight); sexual and physical abuse (some weight); organic brain damage (little weight); pedophilia and compulsive mental disorder (some weight); and remorse (some weight).[2] The trial court concluded that the aggravating factors far outweighed the mitigating

_____

2. The circuit court grouped the seventy-one nonstatutory mitigators proposed by Ault into these six categories.

- 4 -

factors and that the circumstances of the case and Ault's history placed the case in the category of the most aggravated and least mitigated of first-degree murders. Thus, the court sentenced Ault to death for both murders.

Ault appeals his convictions and sentences to this Court, raising nine issues on appeal. Ault contends that: (1) the trial court erred in denying his motion to suppress his statements to the police; (2) the trial court erred in granting the State's challenge for cause of juror Reynolds; (3) the trial court erred in denying his motion for a penalty phase mistrial based on the prosecutor's questioning of witnesses about collateral crimes; (4) the trial court erred by not allowing a defense expert to express his opinion as to the applicability of a statutory mental mitigating factor; (5) the trial court erred in permitting two penalty phase witnesses to testify about hearsay evidence; (6) the trial court erred in denying his request to discharge penalty phase counsel; (7) the aggravating circumstance that the murder was committed in the course of a specified felony is unconstitutional; (8) his death sentence violates the principles announced in Apprendi v. New Jersey, 530 U.S. 466, (2000); and (9) the trial court erred in sentencing him under the 1995 sentencing guidelines for the noncapital offenses and in imposing a departure sentence without contemporaneous written reasons for the departure. The State addresses one issue relating to this Court's proportionality review of the death sentences on appeal. The State contends that Ault's two death sentences are proportional in light of the six aggravating factors, no statutory mitigating factors, and the weak nonstatutory mitigating factors.

Ault v. State, 866 So. 2d 674, 677-79 (Fla. 2003) (hereinafter "Ault I"). This Court affirmed Ault's convictions, vacated his death sentence, and remanded for a new penalty phase based on the error in jury selection. Id. at 683-88. This Court also remanded for resentencing of the non-capital counts for use of proper guidelines. Id. at 688.

Resentencing began July 30, 2007:

The State began its case by presenting evidence of Ault's criminal history. Three witnesses testified that as young girls they were sexually assaulted by Ault, the first in 1988 when she was twelve years old, the second in 1994 when she was seven years old, and the third in 1995 when she was eleven years old. The last of these three witnesses testified that after the assault Ault told her that what he did was wrong and that she needed to call the police. The jury was also read the testimony of another witness, a police officer, who had testified at the previous trial that Ault and another man attacked him at knifepoint in 1986.

The State also presented evidence relating to the deaths of Deanne Mu'min and Alicia Jones. The original crime scene investigator was called to identify photos of the locations in which the events surrounding the offenses took place. The medical examiner who conducted the victims' autopsies was also called to testify regarding the causes of death. Finally, the State called William Rhodes, who recounted his role in the investigation and identified the audio recording of his interrogation of Ault, which was played to the jury. The State also called witnesses to give victim impact evidence, including the victims' mother, one of the victims' teachers, and other individuals who knew their family.

At the close of the State's case, the defense presented three witnesses to establish mitigation. The first witness, psychiatrist Dr. David Kramer, testified that he had conducted a two-hour psychiatric screening of the defendant and had reviewed mental health reports on Ault written by other doctors. Regarding Ault's family background, Dr. Kramer testified that Ault's family moved frequently when he was a child and that Ault's parents had a dysfunctional marriage. According to Dr. Kramer, Ault reported that his older brother began a pattern of forced sexual abuse when he was seven years old, and that his brother sometimes used a knife or gun. Dr. Kramer testified that such experiences would have a negative effect on a child's mental health and sexual development, and diagnosed Ault with complex posttraumatic stress disorder. Dr. Kramer also diagnosed Ault with pedophilia, which he defined as an intense persistent arousal to inappropriate stimuli, being prepubescent children in an adult, and found that Ault had a history of alcohol abuse and dependency and some history of other substance use.

The next defense witness, neurologist Dr. David Ross, testified that he conducted various tests on Ault and concluded that Ault

suffered from deficiencies in the frontal and temporal lobes of his brain. Dr. Ross testified that someone with these deficiencies may have problems with the execution of complex ideas, impaired judgment, difficulties with impulse control and emotional issues, and possible hypersexuality. He also stated that these deficiencies are consistent with individuals diagnosed with pedophilia.

The final witness presented by the defense was Robert Buckley, a private investigator. Buckley testified that he spoke with Ault's mother, Barbara [Matson], who told him that Ault no longer had a relationship with his older brother Charles due to the sexual abuse that occurred when Ault was younger. According to Buckley, [Matson] stated that she was aware of the molestation but explained that the matter was not talked about in their family. At the end of Buckley's testimony, the defense rested.

In rebuttal, the State read to the jury the transcript testimony of Dr. Sherry [Bourg] Carter, a psychologist who had testified at Ault's previous trial. Dr. Carter testified that, at the time of her initial meeting with Ault, Ault reported that he had heard voices and suffered from hallucinations in the past, but that he was on medications to control these conditions. However, she found that his descriptions of his symptoms were inconsistent with each other and were also not consistent with medical knowledge regarding hallucinations. Based on interviews with Ault and a review of other records, Dr. Carter diagnosed Ault with severe psychopathy. Dr. Carter explained that this was a personality disorder rather than a mental illness. She defined a major mental illness as a condition that causes someone to be out of touch with reality or to lose control of his or her thought process. By contrast, individuals with personality disorders have reasonable control over their actions, but are impaired in their ability to relate to others, experience emotion, or behave in a socially appropriate manner. Such individuals, she explained, view others as objects rather than as people and have difficulty experiencing remorse. Overall, Dr. Carter concluded that Ault was faking mental illness in order to avoid responsibility for his actions. Dr. Carter also found that Ault was inconsistent in his reports of the sexual abuse he claimed to have suffered as a child and that, because he had given so many different versions of the events, it was difficult to evaluate whether any of his claims were truthful.

At the end of the proceedings, the jury recommended death by a vote of nine to three for the murder of Deanne Mu'min and

recommended death by a vote of ten to two for the murder of Alicia Jones. In his written sentencing order, the trial judge found six aggravating circumstances applicable to both murders: (1) Ault was previously convicted of a felony and placed on community control (significant weight); (2) Ault was previously convicted of another capital felony or of a felony involving the use or threat of violence to another person (great weight); (3) the capital felony was committed while Ault was engaged in the commission of or an attempt to commit the crimes of sexual battery, aggravated child abuse, and kidnapping (great weight); (4) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest (significant weight); (5) the victim of the crime was a person less than twelve years of age; (6) the capital felony was especially heinous, atrocious, or cruel (HAC) (maximum weight).

The court found no statutory mitigating circumstances and three nonstatutory mitigating circumstances: (1) Ault was raised in a dysfunctional family (little weight); (2) Ault was not adequately supervised by the Department of Corrections (little weight); (3) Ault told a victim of a prior sexual assault to call the police and that what he did was wrong (some weight). The court determined that the aggravating circumstances far outweighed the mitigating circumstances, noting specifically that the single aggravator of the murders being especially heinous, atrocious, or cruel was of such a magnitude as to overwhelm the mitigators. Following the jury's recommendation, the trial judge sentenced Ault to death for each count of first-degree murder, and to fifteen years in prison for each of the remaining offenses. Ault appeals, raising numerous claims of error.

Ault v. State, 53 So. 3d 175, 184-86 (Fla. 2010) (footnotes omitted) (hereinafter "Ault II").

In the direct appeal of his new penalty phase, Ault argued that the trial court erred in rejecting mitigating factors. This Court agreed, but found the error harmless beyond a reasonable doubt given the extensive aggravation in Ault's case. Id. at 195-96. Ault also challenged his sentences based on proportionality,

the admission of photographic evidence, the weight given to the jury's recommendation, the failure to prepare a Presentencing Investigation Report, Ault's exclusion from a pretrial conference, a motion to disqualify the judge based on bias, the denial of Ault's pro se motions, and the constitutionality of Florida's death penalty scheme. Id. at 196-207. This Court affirmed his sentences of death. Id. at 207. The United States Supreme Court denied certiorari on October 3, 2011. Ault v. Florida, 565 U.S. 871 (2011).

Ault filed an initial motion for postconviction relief on September 18, 2012, and an amended motion on July 19, 2013, alleging that both guilt and penalty phase counsel were ineffective under Strickland v. Washington, 466 U.S. 668 (1984). In his initial and amended rule 3.851 postconviction motions, Ault alleged the following distinct claims: (1) guilt phase counsel Kevin Kulick's performance was deficient because he made omissions and conceded guilt in the opening statement, failed to cross-examine witnesses, and failed to investigate defenses such that Ault was prejudiced; (2) penalty phase counsel Mitchell Polay was ineffective for failing to raise rejected statutory mental health mitigation as nonstatutory during the 2007 penalty phase; (3) Mr. Polay was ineffective for failing to investigate and raise Ault's low IQ as mitigation; (4) Mr. Polay was ineffective for failing to adequately prepare Dr. Kramer for trial; (5) Mr. Polay was ineffective for failing to investigate and present mitigation; (6) Mr. Polay was

ineffective for allowing the State to read Dr. Bourg Carter's 1999 penalty phase testimony into evidence rather than seeking her live testimony in the 2007 penalty phase; and (7) Mr. Polay was ineffective for failing to move the trial court for dismissal, and appellate counsel was ineffective for failing to make a claim based on Ault's demands for speedy trial.[3] The postconviction court granted an evidentiary hearing on a portion of the claim relating to expert witness Dr. Bourg Carter's prior testimony and summarily denied the other claims. In this appeal, Ault argues that the postconviction court erred in denying each of the claims,

---

3. In his initial rule 3.851 postconviction motion, Ault alleged the following claims: (1) penalty phase counsel Mitchell Polay was ineffective for failing to object to Dr. Bourg Carter's 1999 testimony being read into evidence and failing to prepare during the 2007 penalty phase; (2) Mr. Polay was ineffective for failing to raise rejected statutory mitigation as non-statutory during the 2007 penalty phase; (3) Mr. Polay was ineffective for failing to investigate Ault's low IQ which should have been found as a mitigating factor; and (4) Mr. Polay was ineffective for failing to adequately prepare Dr. Kramer for trial. Ault alleged the following claims in his amended rule 3.851 postconviction motion: (1) guilt phase counsel Kevin Kulick's performance was deficient because he made omissions and conceded guilt in opening statement, failed to cross-examine witnesses, and failed to investigate defenses such that Ault was prejudiced; (2) Mr. Polay was ineffective for failing to move the trial court for dismissal, and appellate counsel was ineffective for failing to make a claim based on Ault's demands for speedy trial; (3) Mr. Polay was ineffective for failing to object to Dr. Bourg Carter's 1999 testimony being read into evidence and failing to prepare during the 2007 penalty phase; (4) Mr. Polay was ineffective for failing to raise non-statutory mental health mitigation during the 2007 penalty phase; and (5) Mr. Polay was ineffective for failing to investigate Ault's low IQ, which should have been found as a mitigating factor.

- 10 -

except Ault does not challenge the denial of the claim related to his demands for speedy trial.

## INEFFECTIVE ASSISTANCE OF GUILT PHASE COUNSEL

When evaluating an initial rule 3.851 postconviction motion, an evidentiary hearing must be held if the movant makes a facially sufficient claim requiring a factual determination. See Amendments to Fla. Rules of Crim. Pro. 3.851, 3.852 & 3.993, 772 So. 2d 488, 491-92 n.2 (Fla. 2000) (hereinafter "Amendments I"). Because the decision to grant an evidentiary hearing on a rule 3.851 motion is based on written materials before the court, the court's ruling is a pure question of law this Court reviews de novo. See State v. Coney, 845 So. 2d 120, 137 (Fla. 2003). When reviewing the summary denial of an initial rule 3.851 motion, this Court must accept the movant's factual allegations as true and affirm the ruling only if the filings show that the movant has failed to state a facially sufficient claim or that there is no issue of material fact to be determined. See generally Amendments I, 772 So. 2d at 491-92 n.2.

Where there is any question that a facially sufficient claim in an initial rule 3.851 motion requires a factual determination, this Court presumes an evidentiary hearing is required. See id. This Court will affirm a summary denial "only when the claim is legally insufficient, should have been brought on direct appeal, or [is] positively refuted by the record." Jackson v. State, 127 So. 3d 447, 460 (Fla. 2013)

- 11 -

(quoting Reynolds v. State, 99 So. 3d 459, 471 (Fla. 2012)); see also Boyd v. State, 200 So. 3d 685, 699 (Fla. 2015).  Conclusory, nonspecific allegations are insufficient to obtain an evidentiary hearing on ineffective assistance of counsel in capital cases.  See Wilcox v. State, 143 So. 3d 359, 388-89 (Fla. 2014); Doorbal v. State, 983 So. 2d 464, 482-83 (Fla. 2008).

This Court has determined that, in order to succeed on an ineffective assistance of counsel claim under Strickland, two elements must be satisfied:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.  A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.

Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986) (citations omitted). Because both prongs of the Strickland test present mixed questions of law and fact, this Court defers to the circuit court's factual findings that are supported by competent, substantial evidence, and reviews the circuit court's legal conclusions de novo.  See Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004).

There is a strong presumption that trial counsel's performance was not ineffective.  See Strickland, 466 U.S. at 690.  This Court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances

- 12 -

of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). "Judicial scrutiny of counsel's performance must be highly deferential." Id. In Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000), this Court held that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."

In the first claim of Ault's amended motion, Ault argued that guilt phase counsel Kevin Kulick mounted a constitutionally insufficient defense. Ault alleged Mr. Kulick's performance was deficient for conceding guilt when he told the jury in opening statement about Ault's prior crimes, including arrest for rape and sexual battery of a child, and about a news media interview Ault gave. Ault claimed Mr. Kulick's conduct was deficient when he told the jury Ault is borderline intellectually disabled and presented no supporting evidence in the guilt phase. Ault also alleged that counsel was deficient for discussing a voluntary intoxication defense, for telling the jury that an instruction on voluntary intoxication would be given, and for ultimately not securing the instruction. Ault further argued that Mr. Kulick was deficient for only cross-examining State witness Detective William

Rhodes and resting without presenting any evidence. As to Strickland prejudice, Ault alleged generally that Mr. Kulick's alleged deficiencies collectively created a reasonable probability that the outcome of the guilt phase would be different, undermining confidence in the verdict such that Ault was prejudiced.

We affirm the postconviction court's summary denial of this claim because the record conclusively refutes the existence of Strickland prejudice. See Boyd, 200 So. 3d at 699. Regardless of what further investigation, cross-examination, or alternative defenses Mr. Kulick might have conducted, the jury would still have heard Ault's detailed confession, in which he described how he tested the victims' trust by giving them a ride before the assault, the details of the assault, and how he believed he had to kill the victims so that he would not go back to jail and further traumatize his wife. In light of the evidence of Ault's guilt, there is no reasonable probability that the alternative defense strategies Ault suggests in this claim undermine confidence in his convictions. Because Ault failed to establish prejudice, we need not make a specific ruling on the performance component of the Strickland ineffective assistance test. Maxwell, 490 So. 2d at 932. Therefore, we deny relief on this claim.

## HURST RELIEF

On remand from the United States Supreme Court, this Court interpreted Hurst v. Florida to "require[] that all the critical findings necessary before the trial

- 14 -

court may consider imposing a sentence of death must be found unanimously by the jury." Hurst v. State, 202 So. 3d 40, 44 (Fla. 2016) (hereinafter "Hurst"). These findings "include the existence of each aggravating factor that has been proven beyond a reasonable doubt, the finding that the aggravating factors are sufficient, and the finding that the aggravating factors outweigh the mitigating circumstances." Id. This Court has determined that Hurst applies to a sentence that was final in 2009. See Mosley v. State, No. SC14-436, slip op. at 63 (Fla. Dec. 22, 2016). Ault's sentence was final in 2011. See Ault v. Florida, 565 U.S. at 871. Therefore, Hurst is also applicable to Ault's case, and this Court must examine whether any Hurst error was harmless beyond a reasonable doubt.

We explained the appropriate standard for harmless error review in Hurst:

> Where the error concerns sentencing, the error is harmless only if there is no reasonable possibility that the error contributed to the sentence. See, e.g., Zack v. State, 753 So. 2d 9, 20 (Fla. 2000). Although the harmless error test applies to both constitutional errors and errors not based on constitutional grounds, "the harmless error test is to be rigorously applied," [State v.] DiGuilio, 491 So. 2d [1129,] 1137 [Fla. 1986], and the State bears an extremely heavy burden in cases involving constitutional error. Therefore, in the context of a Hurst v. Florida error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to Hurst's death sentence in this case. We reiterate:
>
> > The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a

> device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact.
>
> DiGuilio, 491 So. 2d at 1139. "The question is whether there is a reasonable possibility that the error affected the [sentence]." Id.

Hurst, 202 So. 3d at 68 (alteration in original). In other words, it must be clear beyond a reasonable doubt that a rational jury would have found all facts necessary to impose death unanimously and would have determined that death is the appropriate sentence. In Ault's case, there is no such clarity for either recommendation of death.

After resentencing, the jury recommended death for the murder of Deanne Mu'min by a vote of nine to three and for the murder of Alicia Jones by a vote of ten to two. The circuit court agreed with the jury, finding three nonstatutory mitigators given some or little weight and six statutory aggravators, each given great, significant, or maximum weight. In light of the nonunanimous recommendations of death and failure of the jury to make any findings as to the aggravating and mitigating factors, any attempt to discern what jurors would have done if properly instructed under Hurst is purely speculative. Therefore, we cannot conclude that the Hurst error in Ault's resentencing was harmless beyond a reasonable doubt.

## CONCLUSION

Based on the foregoing, we affirm the postconviction court's denial of relief on Ault's ineffective assistance of guilt phase counsel claim, we do not address his remaining ineffective assistance of penalty phase counsel claims, and we grant relief under Hurst. Accordingly, we vacate his sentences of death and remand his case for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
POLSTON, J., concurs in part and dissents in part with an opinion, in which
CANADY and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

POLSTON, J., concurring in part and dissenting in part.

I concur with the majority's decision except its vacating of the death sentence pursuant to Hurst.

CANADY and LAWSON, JJ., concur.

An Appeal from the Circuit Court in and for Broward County,
     Marc H. Gold, Judge - Case No. 061996CF021248A88810

Young T. Tindall, Fort Lauderdale, Florida,

     for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Leslie T. Campbell,
Assistant Attorney General, West Palm Beach, Florida,

     for Appellee