PER CURIAM.
Howard Steven Ault was sentenced to death for the first-degree murders of two sisters, eleven-year-old Deanne Mu’min and seven-year-old Alicia Jones. This is Ault’s second appearance before this Court. On his previous direct appeal, we affirmed Ault’s convictions but vacated his sentences and remanded to the trial court for a new penalty phase before a new jury. Ault v. State, 866 So.2d 674 (Fla.2003). A new penalty phase was held, and Ault was again sentenced to death for each of the two counts of first-degree murder. Ault now appeals, raising various issues. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the sentences.
FACTS AND PROCEDURAL HISTORY
This Court discussed the facts surrounding Ault’s offenses on his previous direct appeal. We recounted that Ault first met the victims at John Easterlin Park in Bro-ward County, where the girls, their mother, and them two-year old sister were living in a trailer attached to the family car.
On Monday, November 4, 1996, the two girls left school at 2:05 p.m. Witnesses saw the girls walking home, but the girls never arrived at the park. Their mother looked for them at school and eventually went to Ault’s house later in the evening. Ault stated that he had not seen the girls and asked the mother not to call the police as he had some problems with the police in the past. The mother went to her cousin’s house and called the police. The police went to Ault’s apartment and asked whether he had seen the girls. Ault stated that he had not seen the girls and allowed the officers to look around his apartment.
Ault and his wife voluntarily agreed to come to the Oakland Park Police Department to give sworn statements the next day. Detective William Rhodes, the lead officer on the case, interviewed Ault and his wife at the police department. Ault stated that he had only met the girls once a few days earlier in East-erlin Park, and that the girls had never been in his truck. Shortly after this interview, Officer Deborah Cox of the Broward County Sheriffs Department arrested Ault on an unrelated charge of attempted sexual battery of a minor that had occurred eleven months earlier. Ault was taken to the Broward County jail. In the meantime, Rhodes located witnesses who had seen the girls in Ault’s truck, had seen Ault with the girls on several occasions, and had seen Ault and his vehicle at the convenience store *183 at the approximate time that the girls were walking home from school on the day they disappeared, all of which contradicted Ault’s voluntary statement.
The next day, Rhodes visited Ault at the Broward County jail and explained that his investigation of the girls’ disappearance indicated that Ault had lied at the initial interview. When Ault indicated his desire to speak to Rhodes, Rhodes read Ault his Miranda[1] rights and Ault waived these rights. Ault confessed that he had killed the girls within an hour after he had taken them to his apartment. Ault agreed to show Rhodes where the bodies were. Ault led the police to his apartment, confessed that the girls were in the attic, and explained that the officers who had looked around the night before had not looked in the attic. Ault signed a consent-to-search form and the police found the girls’ bodies in the attic as Ault had stated.
Ault was taken to the Oakland Park Police Department and insisted that he would only speak to Rhodes. Ault then gave a taped confession in which he revealed the following details. Ault planned to sexually assault the girls when he met them in front of the convenience store about 2:30 p.m. on November 4, 1996. He offered the girls a ride, and lured them to his house with the promise of candy. He sexually assaulted eleven-year-old Deanne with his finger and also penetrated her with his penis. When Deanne started to scream and fight, Ault strangled her until she stopped screaming. He then strangled seven-year-old Alicia to keep her from telling anyone about the incident, but he did not sexually assault her. Ault redressed Deanne and put the bodies of both girls in his attic. Ault said that he killed the girls because he was afraid they would tell someone what he had done. Because he was already on community control for sexual assault on a child under twelve years of age, he feared that he would go to jail for at least twenty-five years. He also stated that he thought about the trauma his wife had experienced when he was previously arrested and did not want to put her through that trauma again.
The medical examiner testified that both girls died from manual strangulation, that there was bruising and hemorrhaging of Deanne’s vaginal tissue, that Deanne had been dead for approximately two days when her body was found, and that, based on the decomposition of her body, Alicia had died twelve to eighteen hours after Deanne. Based on the lesser state of decomposition of Alicia’s body and a white foamy substance coming from her mouth, the medical examiner stated that Alicia appeared to have been alive, albeit comatose, at the time she was placed in the attic.
Ault, 866 So.2d at 677-78.
The guilt phase of Ault’s jury trial concluded on August 11, 1999. Ault was convicted of two counts of first-degree murder, two counts of kidnapping, two counts of sexual battery on a person less than twelve years of age (both upon Deanne Mu’min), and two counts of aggravated child abuse. After the penalty phase proceedings were completed, the judge followed the recommendation of the jury and imposed a sentence of death for each murder. Id. at 677-79.
In his first direct appeal to this Court, Ault raised only one guilt phase issue. Ault argued that the trial court had erred in denying his motion to suppress the statements made to Detective Rhodes *184 following his arrest on the unrelated sexual battery charge. We determined that the motion to suppress was properly denied and rejected Ault’s claim. See Ault, 866 So.2d at 679-83. We also found that the evidence presented at trial was sufficient to support Ault’s convictions. We therefore affirmed Ault’s convictions for first-degree murder, sexual battery, kidnapping, and aggravated child abuse. See id. at 683. As to the sentencing phase, however, we found that the trial court had erred in granting a challenge for cause of a potential juror. We found that, although the potential juror had voiced a general opposition to the death penalty, she had also agreed that she could place her personal feelings aside and be fair and impartial when making her decisions in the case. See id. at 685-86. The erroneous exclusion of a potential juror is not subject to harmless error review. Id. at 686 (citing Gray v. Mississippi, 481 U.S. 648, 664-65, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987)). Accordingly, we vacated Ault’s sentences of death and remanded for a new penalty phase. See id.
The new penalty phase was held from July 30, 2007, through August 21, 2007. The State began its case by presenting evidence of Ault’s criminal history. Three witnesses testified that as young girls they were sexually assaulted by Ault, the first in 1988 when she was twelve years old, the second in 1994 when she was seven years old, and the third in 1995 when she was eleven years old. The last of these three witnesses testified that after the assault Ault told her that what he did was wrong and that she needed to call the police. The jury was also read the testimony of another witness, a police officer, who had testified at the previous trial that Ault and another man attacked him at knifepoint in 1986.
The State also presented evidence relating to the deaths of Deanne Mu’min and Alicia Jones. The original crime scene investigator was called to identify photos of the locations in which the events surrounding the offenses took place. The medical examiner who conducted the victims’ autopsies was also called to testify regarding the causes of death. Finally, the State called William Rhodes, who recounted his role in the investigation and identified the audio recording of his interrogation of Ault, which was played to the jury. The State also called witnesses to give victim impact evidence, including the victims’ mother, one of the victims’ teachers, and other individuals who knew their family.
At the close of the State’s case, the defense presented three witnesses to establish mitigation. The first witness, psychiatrist Dr. David Kramer, testified that he had conducted a two-hour psychiatric screening of the defendant and had reviewed mental health reports on Ault written by other doctors. Regarding Ault’s family background, Dr. Kramer testified that Ault’s family moved frequently when he was a child and that Ault’s parents had a dysfunctional marriage. According to Dr. Kramer, Ault reported that his older brother began a pattern of forced sexual abuse when he was seven years old, and that his brother sometimes used a knife or gun. Dr. Kramer testified that such experiences would have a negative effect on a child’s mental health and sexual development, and diagnosed Ault with complex posttraumatic stress disorder. Dr. Kramer also diagnosed Ault with pedophilia, which he defined as an intense persistent arousal to inappropriate stimuli, being prepubescent children in an adult, and found that Ault had a history of alcohol abuse and dependency and some history of other substance use.
*185 The next defense witness, neurologist Dr. David Ross, testified that he conducted various tests on Ault and concluded that Ault suffered from deficiencies in the frontal and temporal lobes of his brain. Dr. Ross testified that someone with these deficiencies may have problems with the execution of complex ideas, impaired judgment, difficulties with impulse control and emotional issues, and possible hypersexu-ality. He also stated that these deficiencies are consistent with individuals diagnosed with pedophilia.
The final witness presented by the defense was Robert Buckley, a private investigator. Buckley testified that he spoke with Ault’s mother, Barbara Madson, who told him that Ault no longer had a relationship with his older brother Charles due to the sexual abuse that occurred when Ault was younger. According to Buckley, Mad-son stated that she was aware of the molestation but explained that the matter was not talked about in their family. At the end of Buckley’s testimony, the defense rested.
In rebuttal, the. State read to the jury the transcript testimony of Dr. Sherry Bourge Carter, a psychologist who had testified at Ault’s previous trial. Dr. Carter testified that, at the time of her initial meeting with Ault, Ault reported that he had heard voices and suffered from hallucinations in the past, but that he was on medications to control these conditions. However, she found that his descriptions of his symptoms were inconsistent with each other and were also not consistent with medical knowledge regarding hallucinations. Based on interviews with Ault and a review of other records, Dr. Carter diagnosed Ault with severe psychopathy. Dr. Carter explained that this was a personality disorder rather than a mental illness. She defined a major mental illness as a condition that causes someone to be out of touch with reality or to lose control of his or her thought process. By contrast, individuals with personality disorders have reasonable control over their actions, but are impaired in their ability to relate to others, experience emotion, or behave in a socially appropriate manner. Such individuals, she explained, view others as objects rather than as people and have difficulty experiencing remorse. Overall, Dr. Carter concluded that Ault was faking mental illness in order to avoid responsibility for his actions. Dr. Carter also found that Ault was inconsistent in his reports of the sexual abuse he claimed to have suffered as a child and that, because he had given so many different versions of the events, it was difficult to evaluate whether any of his claims were truthful.
At the end of the proceedings, the jury recommended death by a vote of nine to three for the murder of Deanne Mu’min and recommended death by a vote of ten to two for the murder of Alicia Jones. In his written sentencing order, the trial judge found six aggravating circumstances applicable to both murders: (1) Ault was previously convicted of a felony and placed on community control (significant weight); (2) Ault was previously convicted of another capital felony or of a felony involving the use or threat of violence to another person (great weight); (3) the capital felony was committed while Ault was engaged in the commission of or an attempt to commit the crimes of sexual battery, aggravated child abuse, and kidnapping (great weight); (4) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest (significant weight); (5) the victim of the crime was a person less than twelve years of age;[2] (6) *186 the capital felony was especially heinous, atrocious, or cruel (HAC) (maximum weight).
The court found no statutory mitigating circumstances and three nonstatutory mitigating circumstances: (1) Ault was raised in a dysfunctional family (little weight);[3] (2) Ault was not adequately supervised by the Department of Corrections (little weight); (3) Ault told a victim of a prior sexual assault to call the police and that what he did was wrong (some weight). The court determined that the aggravating circumstances far outweighed the mitigating circumstances, noting specifically that the single aggravator of the murders being especially heinous, atrocious, or cruel was of such a magnitude as to overwhelm the mitigators. Following the jury’s recommendation, the trial judge sentenced Ault to death for each count of first-degree murder, and to fifteen years in prison for each of the remaining offenses. Ault appeals, raising numerous claims of error.
ISSUES ON APPEAL
Mitigating Circumstances
In points one through ten of his Initial Brief, Ault challenges the trial court’s decision to reject statutory mental health mitigation, to reject certain nonstat-utory mitigating factors, and to consolidate other nonstatutory mitigating factors and to assign them little weight. Trial courts must observe the following standards when evaluating mitigating circumstances during capital sentencing:
A trial court must find as a mitigating circumstance each proposed factor that has been established by the greater weight of the evidence and that is truly mitigating in nature. However, a trial court may reject a proposed mitigator if the mitigator is not proven or if there is competent, substantial evidence to support its rejection. Even expert opinion evidence may be rejected if that evidence cannot be reconciled with other evidence in the case. Finally, even where a mitigating circumstance is found a trial court may give it no weight when that circumstance is not mitigating based on the unique facts of the case.
Coday v. State, 946 So.2d 988, 1003 (Fla.2006).
In its written sentencing order, the trial court must expressly evaluate each statutory and nonstatutory mitigating circumstance proposed by the defendant. See Ferrell v. State, 653 So.2d 367, 371 (Fla.1995). Where it is clear that the trial court has considered all evidence present *187 ed in support of a mitigating factor, the court’s decision as to whether that circumstance is established will be reviewed only for abuse of discretion. See Harris v. State, 843 So.2d 856, 868 (Fla.2003); Foster v. State, 679 So.2d 747, 755 (Fla.1996). The trial court’s findings will be upheld where there is competent, substantial evidence in the record to support each finding. See Lebron v. State, 982 So.2d 649, 660 (Fla.2008). The weight assigned to an established mitigating circumstance is also reviewed for abuse of discretion. Id.
When a trial court fails to detail its findings, however, this Court is “deprive[d] ... of the opportunity for meaningful review.” Ferrell, 653 So.2d at 371. In such circumstances, this Court has vacated the defendant’s death sentence and remanded to the trial court with instructions to issue a new sentencing order. See, e.g., id.; Woodel v. State, 804 So.2d 316, 327 (Fla.2001) (remanding for new sentencing order where trial judge failed to discuss substantial evidence supporting each proposed mitigator). However, a trial court’s findings on mitigation are also subject to review for harmless error, and this Court will not overturn a capital appellant’s sentence if it determines that an error was harmless beyond a reasonable doubt. See Lebron, 982 So.2d at 661; Singleton v. State, 783 So.2d 970, 977 (Fla.2001).

Statutory Mental Health Mitigation

We first review the trial court’s rejection of two statutory mental health mitigating circumstances. Prior to sentencing, Ault proposed the following statutory mitigation: (1) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired, see § 921.141(6)(f), Fla. Stat. (2007); and (2) the capital felony was committed while the defendant was under the influence of an extreme mental or emotional disturbance, see § 921.141(6)(b), Fla. Stat. (2007). The trial court rejected both mitigators, finding that neither was warranted in Ault’s case.[4] We agree with the trial court’s rejection of these two mitigators.
In its sentencing order, the trial court evaluated the two statutory mitigating circumstances together, explaining that both proposed factors relied upon the same sources of information, namely, the testimony of Drs. Kramer, Ross, and Carter. The court first evaluated Dr. Kramer’s testimony, noting that Dr. Kramer had concluded that Ault suffered from post-traumatic stress disorder (PTSD), pedophilia, and polysubstance abuse. However, the court questioned the sufficiency of Dr. Kramer’s preparation. It noted that Dr. Kramer had only conducted a single two-hour interview with Ault and that, aside from this meeting, his only sources of information came from the reports of other doctors. Further, the court found that Dr. Kramer had reviewed no documentation of the crime itself.
In direct contrast to Dr. Kramer, Dr. Carter testified that Ault did not suffer from PTSD and that he was a severe psychopath seeking to exaggerate mental illness. The court noted that her testimony was based on established, standardized tests within the field of psychology. In addition to these tests, Dr. Carter conducted interviews with Ault in which she found that he neither manifested nor reported any symptoms of PTSD. Based on Dr. Carter’s testimony, the court determined *188 that the conclusions of Dr. Kramer were less than reliable.
The court also evaluated the testimony of the neurologist, Dr. Ross. Based on EEG and PET scan testing, Dr. Ross testified that Ault had an abnormal brain, with deficits primarily in the right frontal area and temporal lobes. He stated that the former is the analytical portion of the brain, while the latter relate to the integration of memory and emotions. Dr. Ross testified that deficits in these areas are consistent with individuals diagnosed with pedophilia. However, the court found it significant that Dr. Ross had not provided an opinion as to whether Ault qualified for either statutory mental health miti-gator. In evaluating the importance of Dr. Ross’s testimony, the court reviewed Ault’s behavior surrounding the offenses. The court determined that none of Ault’s actions in terms of the planning or executing of the crimes leading up to the murders of the victims suggested that Ault’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, or that he was under the influence of an extreme mental or emotional disturbance. Accordingly, the trial court found that neither mitigator was appropriate in Ault’s case.
Based on a review of the trial judge’s sentencing order, the trial court appears to have considered all evidence relating to the proposed statutory mitigating circumstances and properly exercised its discretion in rejecting both. See Provenzano v. State, 497 So.2d 1177, 1184 (Fla.1986) (“As long as the court considered all of the evidence, the trial judge’s determination of lack of mitigation will stand absent a palpable abuse of discretion.”). Only three experts testified regarding mental health mitigation. The first, Dr. Kramer, testified that he believed both statutory mental health mitigators applied to Ault. The second, Dr. Ross, did not offer an opinion. The third, Dr. Carter, testified that neither statutory mitigator applied. The court evaluated the evidence relied on by each expert and determined that Dr. Carter’s conclusion was more reliable and credible than that of Dr. Kramer. This review is consistent with our precedent on the evaluation of mitigating factors.
Further, there is competent, substantial evidence in the record to support the trial court’s rejection of both factors. First, the record demonstrates that Ault was not substantially impaired in his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. We have upheld a trial court’s rejection of this mitigating circumstance when a defendant’s actions during and after the crime has indicated that he was aware of the criminality of his conduct. In Nelson v. State, 850 So.2d 514, 531 (Fla.2003), for example, we upheld the trial court’s ruling where the defendant removed the victim from her home after sexually assaulting her, drove to two separate orange groves before killing her, and lied to police about the crime. We found that the defendant’s “purposeful actions [were] indicative of someone who knew those acts were wrong and who could conform his conduct to the law if he so desired.” Id. Similarly, in Hoskins v. State, 965 So.2d 1, 18 (Fla.2007), we found that the trial court properly rejected the defendant’s inability “to appreciate the criminality of his conduct” as mitigation where, after raping the victim, “Hoskins’s purposeful actions in binding and gagging [the victim] before placing her in the trunk, driving to his parents’ home six hours away, borrowing a shovel, driving to a remote area where he killed [the victim], and then telling his brother he hit a possum when blood was noticed dripping from *189 the rear wheel well [were] indicative of someone who knows his conduct is wrong.”
Here, Ault’s conduct demonstrates that he was aware of the criminality of his actions. Indeed, he stated during his pretrial interrogation that he murdered the victims specifically because he was afraid of being sent back to prison. He also redressed Deanne Mu’min, placed the victims in his attic, and lied to both the victims’ mother and the police regarding his knowledge of the girls’ disappearance. As the trial court observed, no part of Ault’s conduct suggests that he was unaware that his actions were criminal or that he was unable to conform his conduct to the requirements of the law had he chosen to do so.
Second, the record supports the trial court’s rejection of Ault’s claim that he was under the influence of an extreme mental or emotional disturbance at the time of the offenses. In Philmore v. State, 820 So.2d 919, 936 (Fla.2002), the defendant and his co-conspirator agreed to steal a car and kill the driver in order to carry out their plan to rob a bank. We upheld the trial court’s rejection of the “extreme mental or emotional disturbance” mitigating factor where “[t]he facts and circumstances of the homicide indicate[d] a coherent and well thought out plan which spanned over the course of two days,” and the factor was not supported by the testimony of the defendant’s expert witnesses. Id. (quoting sentencing order). We also upheld the trial court’s rejection of this factor in Hoskins based in part on our observation that the crime involved “an element of planning.” 965 So.2d at 17. In this ease, Ault’s admission that he planned the abduction and assault of the victims in advance, as well as the steps taken to conceal his actions, negates a finding that he was under an extreme mental or emotional disturbance at the time of the offense. The trial court’s conclusion is also supported by the testimony of Dr. Carter.
A trial court may properly reject a proposed mitigating circumstance where there is competent, substantial evidence in the record to support its rejection. See Le-brón, 982 So.2d at 660. As we noted in Coday, “[e]ven expert opinion evidence may be rejected if that evidence cannot be reconciled with other evidence in the case.” 946 So.2d at 1003. In the present case, there was sufficient evidence in the record to support the rejection of both mitigating factors. We therefore affirm the trial court’s decision to reject this mitigation.

Brain Damage

In addition to challenging the trial court’s rejection of the two statutory mental health mitigating circumstances, Ault argues that the trial court erred in rejecting several nonstatutory mitigating circumstances. We next review Ault’s contention that the trial court erred in rejecting brain damage as a nonstatutory mitigating circumstance. In considering Ault’s proposed nonstatutory mitigation, the trial court consolidated two proposed mitigators: (1) the defendant suffers from brain damage; and (2) the defendant’s neurological impairment affects his judgment, impulses, control, and information processing skills. In its sentencing order, the trial court’s analysis on this issue stated only that having already addressed the issue as a statutory mitigator, the court had no basis to consider the matter as a nonstatutory mitigating circumstance. We find that this conclusion was error.
As discussed above, the trial court examined the testimony of Dr. Ross when it evaluated whether Ault qualified for either statutory mental health mitigator. It noted that Dr. Ross had testified that Ault suffered from an abnormal brain, with deficits in areas affecting analytical ability and the integration of memory and emo *190 tions, and that such deficits were consistent with pedophilia. The court further noted that these conclusions were based on uncontested, objective tests, specifically EEG and PET scan testing. We concluded that the trial court properly rejected these findings as sufficient proof of statutory mental health mitigation where it determined that stronger evidence leaned against the statutory mitigating factors. See Hoskins, 965 So.2d at 18.
However, the rejection of statutory mental health mitigation did not require the trial court to reject brain damage as an independent nonstatutory mitigating factor. The court’s sentencing order demonstrated that evidence of brain damage was based on uncontroverted objective testing. The court provided no evidence that would support a rejection of these findings. Further, brain damage has been recognized as a mitigating circumstance, although the weight given to such mitigation is within the discretion of the trial judge. See Crook v. State, 813 So.2d 68, 75-76 (Fla.2002) (finding trial court’s failure to consider brain damage as mitigation to be error); Robinson v. State, 761 So.2d 269, 277 (Fla.1999) (upholding trial court’s decision to assign little weight to brain damage as mitigation where no evidence indicated that the impairment affected the defendant’s actions). In this instance, because brain damage was proved by the greater weight of the evidence, there was no competent, substantial evidence to support its rejection, and brain damage is mitigating in nature, we find that the trial court’s rejection of this proposed mitigating circumstance was error.

Good Adjustment to Life in Prison

We next address the trial court’s rejection of the proposed mitigating circumstance that Ault, having successfully completed a prison sentence, could adjust to life in prison. The trial court’s discussion of this factor states only that it did not consider this ability to be a mitigator for murder. We agree with Ault that this ruling was error.
First, the trial court erred in concluding that, as a matter of law, the ability to successfully adjust to a sentence of life in prison is not mitigating in nature. As the United States Supreme Court has observed, while evidence of good conduct in prison does not reduce culpability for a defendant’s crime, it could be mitigating in the sense that it might serve as a basis for a sentence less than death. Skipper v. South Carolina, 476 U.S. 1, 7, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); see also Fead v. State, 512 So.2d 176, 179 (Fla.1987) (finding evidence that the defendant was a model prisoner during his previous commitment constituted a valid mitigating factor).
Second, the trial court failed to provide “specific written findings of fact based upon ... the records of the trial and the sentencing proceedings.” § 921.141(3), Fla. Stat. (2007). During the penalty phase, evidence was presented demonstrating that Ault had completed a term in prison. At the same time, some evidence was presented that might have supported the rejection of this fact as mitigation. For example, Dr. Carter noted that, in reviewing Ault’s personal history, she had reviewed some jail records containing disciplinary reports. The trial court’s order failed to discuss this evidence or to rule on whether the proposed mitigation was proven. As we have previously stated, the failure to “consider and properly evaluate mitigating evidence” deprives this Court “of the tools to meaningfully review the sentence imposed or to undertake a proportionality review.” Harris, 843 So.2d at 869. We find that the trial court’s order was deficient in this regard. Accordingly, *191 we hold that the trial court erred in summarily rejecting the possibility of a positive adjustment to life in prison as a mitigating circumstance.

Emotional or Mental Disturbance

Ault argues that even though the trial court determined that he did not qualify for statutory mental health mitigation, the court should have evaluated whether the evidence qualified as nonstatutory mental health mitigation. We have previously explained that
Florida’s capital sentencing statute does in fact require that emotional disturbance be “extreme.” However, it clearly would be unconstitutional for the state to restrict the trial court’s consideration solely to “extreme” emotional disturbances. Under the case law, any emotional disturbance relevant to the crime must be considered and weighed by the sentencer, no matter what the statutes say. Any other rule would render Florida’s death penalty statute unconstitutional.
Cheshire v. State, 568 So.2d 908, 912 (Fla.1990) (citations omitted).
However, in Davis v. State, 2 So.3d 952, 962-63 (Fla.2008), cert. denied, — U.S. -, 129 S.Ct. 2872, 174 L.Ed.2d 585 (2009), we rejected a challenge to a trial court’s failure to consider nonstatutory mental health mitigation where the defendant’s “impaired capacity” had not been proposed as a nonstatutory factor. We held that “a defendant must raise a proposed nonstatutory mitigating circumstance before the trial court in order to challenge on appeal the trial court’s decision about that nonstatutory mitigating factor.” Id. at 962 (citing Lucas v. State, 568 So.2d 18, 23-24 (Fla.1990)). Here, Ault did not raise nonstatutory mental health mitigation before the trial court. Accordingly, we find that the court did not err in failing to address this mitigating circumstance.

Low IQ

In evaluating Ault’s low IQ as a proposed nonstatutory mitigating circumstance, the trial court’s sentencing order stated that there was no evidence supporting a low IQ. The trial court further stated that the only testimony regarding the defendant’s IQ was that of Dr. Carter, who indicated that Ault’s intellectual functioning was below average.
In the portion of Dr. Carter’s testimony cited in the sentencing order, Dr. Carter stated that, in the testing she conducted, Ault received an overall IQ score of 80, with a range of 78 to 84. She also found that his verbal IQ was 77 with a range of 73 to 83, and his performance IQ was 87 with a range of 81 to 95. Dr. Carter explained that an average score is 100, and that a person is considered to be within normal limits if their score is between 85 and 115. She stated that Ault was not mentally retarded, but that he scored in a low average to borderline range on his IQ test.
Low intelligence has been recognized as valid mitigation in capital sentencing. See Thompson v. State, 648 So.2d 692, 697 (Fla.1994). Admittedly, Ault’s low/borderline IQ score appears to have been slightly higher than in other cases where low intelligence has been weighed as mitigation. See, e.g., Crook, 813 So.2d at 77 (stating that the appellant’s IQ was found to be “as low as 62 or 69 and as high as the low 70s”); Jones v. State, 705 So.2d 1364, 1366 (Fla.1998) (stating that an IQ of 76 was weighed as mitigation). However, this fact goes toward the weight of the mitigation, not whether it should have been found as mitigation. Because the trial court failed to cite any evidence contradicting the finding of the only expert who testified on the issue, we find that its *192 rejection of this mitigating circumstance was error. See Coday, 946 So.2d at 1005 (explaining that expert testimony in support of mitigation “could be rejected only if it did not square with other evidence in the case”).

Acceptance of Responsibility

Ault next challenges the trial court’s rejection of the mitigating circumstance that he accepted responsibility for the killing of Deanne and Alicia. In considering this mitigation, the trial court consolidated three proposed mitigators: (1) Ault accepted responsibility for the killing of Deanne and Alicia; (2) Ault confessed to the crimes he committed; and (3) Ault cooperated with the police and signed a consent to search form. The trial court simply rejected each of these proposed mitigators without explanation. Because the sentencing order is deficient under this Court’s precedent, we find that the trial court’s ruling was error.
First, the trial court failed to discuss any of the evidence presented in support of or in opposition to these proposed miti-gators. See Harris, 843 So.2d at 869. It was uncontroverted that Ault confessed to the crime; his videotaped confession was played to the jury during the penalty phase. Further, Detective Rhodes testified that Ault brought him to his apartment and told him where the victims’ bodies were hidden. At that time, Ault also gave his consent to a search of his home. Other evidence might have been weighed against a finding that Ault accepted responsibility or cooperated with the police. Donna Jones, the victims’ mother, testified that when she arrived at Ault’s home on the day of her daughters’ disappearance, Ault lied and told her that he had not seen the girls. Detective Rhodes testified that Ault and his wife voluntarily came to the Oakland Park Police Department on November 5, the day after the victims’ disappearance, and that Ault again stated that he did not know where the girls were. Ault did not confess to the murders until after he was arrested on an unrelated charge. Ault, 866 So.2d at 677-78. Additionally, Dr. Carter testified that she believed Ault was malingering on psychological evaluations and attempting to fake mental illness in an effort to evade responsibility. She also testified that during the interviews she conducted Ault frequently attempted to place responsibility for the murders on other circumstances or individuals.
Second, each of these factors has been considered mitigating in nature. See Zommer v. State, 31 So.3d 733, 744 (Fla.2010) (stating that the trial court found and assigned little weight to the nonstatutory mitigator that the defendant accepted responsibility for his actions), petition for cert. filed, No. 09-11400 (U.S. June 9, 2010); Sinclair v. State, 657 So.2d 1138, 1140 n. 2 (Fla.1995) (noting that trial court weighed the defendant’s cooperation with police as mitigation); DeAngelo v. State, 616 So.2d 440, 443 (Fla.1993) (noting that the trial court found as mitigation that the defendant confessed to the crime). Because the trial court’s sentencing order fails to evaluate any of the evidence presented at trial relating to this mitigation, and because each proposed circumstance can be mitigating in nature, we find that its ruling on this point was error. See Coday, 946 So.2d at 1003.

Remorse

As an additional nonstatutory mitigator, Ault proposed that the court consider the fact that he was remorseful about his criminal conduct in this case and the prior criminal acts he committed. The trial court, rejecting this mitigation, stated only that it found no credible evidence to support Ault’s claim. Again, the trial *193 court failed to conduct the proper analysis on this issue. A defendant’s remorse can certainly be mitigating in nature, and remorse has frequently been considered as nonstatutory mitigation. See, e.g., Smith v. State, 28 So.3d 838, 853 (Fla.2009), petition for cert. filed, No. 09-10755 (U.S. May 10, 2010); Hernandez v. State, 4 So.3d 642, 655 n. 9 (Fla.), cert. denied, — U.S.-, 130 S.Ct. 160, 175 L.Ed.2d 101 (2009); Hojan v. State, 3 So.3d 1204, 1218 n. 5 (Fla.), cert. denied, — U.S. -, 130 S.Ct. 741, 175 L.Ed.2d 521 (2009); Rodgers v. State, 3 So.3d 1127, 1131 (Fla.2009); see also Smalley v. State, 546 So.2d 720, 723 (Fla.1989) (reducing death sentence to life in prison where, among other factors, the record indicated that defendant felt genuine remorse). If the trial court had determined that this proposed circumstance was proven by the greater weight of the evidence, it was required to weigh the factor as mitigation unless it could cite competent, substantial evidence supporting its rejection. See Coday, 946 So.2d at 1003.
Here, the trial court did not evaluate evidence in the record that might have supported or weighed against a finding that Ault felt remorse for his crimes. On one hand, Detective Rhodes asked Ault during the videotaped interrogation whether he was remorseful and Ault responded that he was. On the other, Dr. Carter diagnosed Ault with severe psychopathy and explained that such individuals have difficulty in showing any signs of remorse. She later stated that when Ault discussed his offenses during interviews, he would show inappropriate emotions or no emotion at all. Dr. Kramer also testified that at times Ault had clearly shown a lack of remorse. The trial court failed to review any of this evidence in arriving at its conclusion. Accordingly, we find that this portion of the sentencing order was deficient and that the trial court’s summary rejection of this mitigation was error.

Pedophilia

Ault also proposed as a nonstatu-tory mitigating circumstance that he suffers from pedophilia and was denied treatment by the Mentally Disordered Sex Offender program while incarcerated because of lack of funding. Rejecting this factor in its sentencing order, the trial court stated only that pedophilia, and the treatment or lack of treatment thereof, is not a mitigator for murder. Again, the trial court failed to discuss evidence supporting its ruling. Dr. Kramer and Dr. Carter each testified that they diagnosed Ault with pedophilia. Dr. Ross also testified that Ault’s brain impairments were consistent with those found in individuals diagnosed with pedophilia.
While the degree to which pedophilia is mitigating as to murder itself is questionable, it has been listed as nonstat-utory mitigation in at least one capital case. See Crain v. State, 894 So.2d 59, 67 n. 9 (Fla.2004) (stating that where the defendant was sentenced to death for the murder of a seven-year-old girl, the trial court gave “some weight” to the fact that the defendant was an uncured pedophile). Further, the diagnosis appears to meet the definition of a mitigating circumstance. We have explained that “[e]vidence is mitigating if, in fairness or in the totality of the defendant’s life or character, it may be considered as extenuating or reducing the degree of moral culpability for the crime committed.” Merck v. State, 763 So.2d 295, 298 (Fla.2000) (citing Wickham v. State, 593 So.2d 191, 194 (Fla.1991)); see also Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (noting that a mitigating circumstance can be “any aspect of a defendant’s character or record and any of the circumstances of the offense” that reasonably may serve as a basis for imposing a sentence less than *194 death). Here, Dr. Kramer testified that pedophilia was a compulsion, an intense arousal and drive to have sexual activity with age-inappropriate partners. Similarly, Dr. Carter stated that pedophilia is a mental illness. In this case, Ault’s pedophilia arguably reduced the degree of moral culpability for his crime because, if not for Ault’s compulsion/mental illness, the actions preceding the murders — Ault’s abduction of the victims — would not have occurred; although, again, the weight assigned to this circumstance would have been within the discretion of the trial judge.[5]
Based on a review of the record, we find that pedophilia was demonstrated by the greater weight of the evidence, was not refuted by competent, substantial evidence, and was mitigating in nature. See Coday, 946 So.2d at 1003. Further, the trial court failed to set out any of the evidence supporting its decision. See Harris, 843 So.2d at 869. Accordingly, we find that the trial court’s summary rejection of pedophilia as a mitigating circumstance was error.

Dysfunctional Family Background

Ault next argues that the trial court erred in consolidating twelve proposed nonstatutory mitigating circumstances into the single category of dysfunctional family background, and also in assigning this mitigation little weight. See supra note 3. The trial court’s analysis of this mitigation is an acknowledgement that Ault suffered hardships in his upbringing and a statement that the twelve factors constitute a single nonstatutory mitigating circumstance.
This Court has permitted trial courts to group into categories proposed mitigating factors that are related in content. For example, in Kearse v. State, 770 So.2d 1119, 1133 (Fla.2000), we found that a trial court had not abused its discretion by grouping thirty-four proposed mitigators into a single category encompassing the defendant’s “difficult childhood and his psychological and emotional condition because of it.” See also Anderson v. State, 863 So.2d 169, 176 n. 6 (Fla.2003) (observing that the trial court consolidated related mitigating circumstances); Reaves v. State, 639 So.2d 1, 6 (Fla.1994) (finding that the trial court reasonably consolidated several proposed mitigating factors into three categories). Here, each of the twelve proposed factors related to abuse and neglect inflicted by Ault’s family during his upbringing. Although it is true that, as Ault argues, these factors could have been grouped into a greater number of categories, we find that the trial court did not err in considering them together. Further, there is no indication that the trial court abused its discretion in assigning little weight to the consolidated miti-gator. See Lebron, 982 So.2d at 660.

Statement to Prior Victim

Ault also objects to the trial court’s finding on the proposed nonstatuto-ry mitigating circumstance based on his statement to a prior victim. In its sentencing order, the trial court evaluated the proposed factor by first recounting that the witness had testified regarding her being the victim of an attempted sexual battery by Ault on December 31, 1995. The witness stated that after she stopped Ault from attacking, Ault told her to call the police and that he further stated that what he did was wrong. The trial court found these statements significant in that they represented a spark of humanity. *195 The court noted that some would argue that the statements represented an ac-knowledgement by Ault of his sexual problems, a reaching out for help. The court found that, while this may have been true, the murders were the result of Ault’s knowing, intentional, and morbidly logical analysis of his predicament, and not the compulsion of pedophilia. The court explained, however, that the spark of humanity must be recognized, and noted that it gave some weight to Ault’s statements in determining the appropriate sentence. Ault argues that this ruling was deficient, contending, first, that the trial court erred in rejecting as mitigation that Ault was reaching out for help with his pedophilia and, second, that the court should have given the issue more weight.
We reject Ault’s challenges to the trial court’s finding. The trial court set out the evidence, determined that the circumstance was both proved by the evidence and mitigating, and assigned weight. This approach complies with the requirements set out by this Court. See Coday, 946 So.2d at 1003. Further, there is no indication that the trial judge abused his discretion. See Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980) (defining abuse of discretion as judicial action that is “arbitrary, fanciful, or unreasonable”). Ault objects only to the trial court’s determination that this factor was not mitigating as it related to pedophilia. However, pedophilia was proposed as a separate mitigating circumstance, which we discuss above as a separate issue. As to the trial court’s determination that Ault’s statements represented a spark of humanity and deserved some weight as mitigation, we find no error.

Harmless Error

Above, we found that the trial court erred in its rejection of the following proposed nonstatutory mitigating circumstances: (1) brain damage; (2) adjustment to life in prison; (3) low IQ; (4) acceptance of responsibility; (5) remorse; (6) pedophilia. However, such error is subject to the harmless error test. See Thomas v. State, 693 So.2d 951, 953 (Fla.1997). In this context, the question is whether there is a reasonable possibility that the error contributed to the sentence. See State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986). Reversal is permitted only if the excluded mitigating factors reasonably could have resulted in a lesser sentence. If there is no likelihood of a different sentence, then the error must be deemed harmless. See Rogers v. State, 511 So.2d 526, 535 (Fla.1987).
In several cases, we have found that a trial court’s error in failing to consider mitigating evidence was harmless in light of the aggravating circumstances. In Rogers, 511 So.2d at 535, for example, we concluded that there was no reasonable likelihood that the trial court would have concluded that the aggravating circumstances of prior violent felony conviction and murder that occurred during flight from an attempted robbery were outweighed by the single mitigating factor of being a good husband, father, and provider. Similarly, in Thomas, 693 So.2d at 953, we concluded that the trial court’s failure to find a number of mitigating circumstances relating to the defendant’s character and work record was harmless in light of the “massive” aggravation (prior violent felony conviction, murder committed during course of a burglary, pecuniary gain, HAC, and CCP). We concluded that even if the trial court had found each mitigating circumstance proposed by the defendant, there was no reasonable doubt that the trial court “still would have imposed the death penalty.” Id. Finally, in Singleton, 783 So.2d at 977, we found that the trial judge’s failure to discuss the miti-gators of the defendant’s courtroom behav *196 ior, his behavior on parole, and his alleged remorse and cooperation with police was harmless error. We concluded that even when this mitigation was combined with other mitigation in the record, it “would not outweigh the two weighty aggravators [of prior violent felony conviction and HAC] found to exist by the trial judge.” Id.[6]
In the present case, the trial court found five aggravators, each of which was assigned either great weight, significant weight, or, as to HAC, maximum weight. The trial court determined that the aggravating circumstances far outweighed the mitigating circumstances. The court further determined that the single aggravator of the murders being especially heinous, atrocious, or cruel was of such a magnitude as to overwhelm the mitigators. In this context, even if each of the rejected factors had been found by the trial court (and it is not certain that the court would have found some of those factors even if it had conducted the proper analysis), we find no reasonable possibility that Ault would have received a different sentence. See DiGuilio, 491 So.2d at 1138. In light of the extensive aggravating circumstances in this case, we find that any error was harmless beyond a reasonable doubt.[7]
Proportionality
We next address the issue of proportionality. In determining whether death is a proportionate punishment, this Court is required to compare the totality of the circumstances of Ault’s case to the circumstances of similar cases in which the Court has affirmed sentences of death. See Gore v. State, 784 So.2d 418, 438 (Fla.2001). We must conduct a two-pronged inquiry, comparing an appellant’s case to other cases to “determine [whether] the crime falls within the category of both (1) the most aggravated, and (2) the least mitigated of murders.” Almeida v. State, 748 So.2d 922, 933 (Fla.1999). “This entails ‘a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.’ ” Offord v. State, 959 So.2d 187, 191 (Fla.2007) (quoting Urbin v. State, 714 So.2d 411, 416 (Fla.1998)).
Ault does not argue that the present offenses were not among the most aggravated. Ault does contend, however, that his case is not among the least mitigated and that death is therefore an inappropriate punishment. Here, the trial court found five aggravating circumstances: (1) that Ault was under community control; (2) that he had a prior violent felony conviction; (3) that the capital felony was committed while Ault was engaged in sexual battery, .aggravated child abuse, and kidnapping, and the victims were less than 12 years old; (4) that the crimes were *197 committed to avoid arrest; and (5) that the murders were HAC. The trial court found no statutory mitigating circumstances and three nonstatutory mitigating circumstances: (1) Ault was raised in a dysfunctional family; (2) Ault was not adequately supervised by the Florida Department of Corrections; and (3) Ault told a previous victim to call the police and that what he did was wrong. We also determined above that the trial court erred in rejecting without evaluation several nonstatutory mitigating circumstances, including brain damage and pedophilia.
This Court has clearly affirmed sentences of death in cases involving similar aggravating circumstances. As we explained in Smith, 28 So.3d at 875, “We have repeatedly affirmed the death penalty where the defendant has kidnapped, sexually battered, and murdered a child victim.” See also Chavez v. State, 832 So.2d 730 (Fla.2002) (affirming death sentence where defendant kidnapped, sexually battered, and strangled to death a nine-year-old victim, where court found as aggravation that defendant was engaged in the crime of kidnapping, that murder was committed to avoid arrest, and that murder was HAC); Schwab v. State, 636 So.2d 3 (Fla.1994) (affirming death sentence for the kidnapping, murder, and sexual battery of an eleven-year-old victim, where prior violent felony, felony murder, and HAC were proven as aggravation).
Further, this Court has affirmed death sentences in cases involving comparable or more significant mitigating circumstances. In Davis v. State, 698 So.2d 1182, 1186-87 (Fla.1997), for example, we affirmed the defendant’s death sentence based on the abduction, molestation, and strangulation of an eleven-year-old girl, despite a finding that the defendant was under the influence of an extreme mental or emotional disturbance, to which the trial court assigned great weight. The trial court also found significant nonstatutory mitigation.[8] See also Rodgers, 3 So.3d at 1131, 1134 (affirming death sentence for first-degree murder where trial court found two aggravators (prior violent felony and CCP), one statutory mitigator (defendant’s age), and numerous nonstatutory mitigators including extensive history of mental illness, sexual abuse by defendant’s mother, physical abuse by defendant’s father, parents’ drug and alcohol addictions, parental abandonment, familial history of suicide, early incarceration and sexual abuse in prison, and genuine remorse for crime); Smithers v. State, 826 So.2d 916, 930 (Fla.2002) (affirming two death sentences where court found CCP aggravator applicable to one murder and prior violent felony and HAC applicable to both, despite finding both statutory mental health mitigators and *198 seven nonstatutory mitigators,[9] and where the father of one victim requested life in prison as a punishment for the defendant).[10]
We find that when viewed within the totality of the circumstances, Ault’s sentences of death are proportionate to his offenses. Ault, while on community control, formed a premeditated plan to abduct Deanne Mu’min and Alicia Jones, ages eleven and seven, for the purpose of sexually assaulting them. He sexually assaulted Deanne Mu’min, and subsequently made the decision to kill her in order to avoid detection and arrest. He then murdered both girls by strangulation, placed the bodies in his attic (although, as forensic evidence later demonstrated, Alicia Jones remained alive, albeit unconscious, for several horn’s after the assault), and lied to both police and the girls’ mother regarding their whereabouts. Even taking into account the nonstatutory mitigation that we determined was improperly rejected by the trial court, Ault’s case is, as a qualitative matter, far less mitigated than comparable offenses for which we have affirmed sentences of death. See, e.g., Davis, 698 So.2d at 1186-87. Based on the facts and circumstances of the present case, we conclude that Ault’s sentences are proportionate when compared with the circumstances of other capital cases.
Admission of Photographs
Next, we review the admission into evidence of four photographs depicting the victims’ condition after death. In determining the admissibility of photographs at trial, this Court has explained:
We have consistently held that the initial test for determining the admissibility of photographic evidence is relevance, not necessity. See Mansfield v. State, 758 So.2d 636 (Fla.2000). Photographs are admissible if “they assist the medical examiner in explaining to the jury the nature and manner in which the wounds were inflicted.” Bush v. State, 461 So.2d 936, 939 (Fla.1985). Moreover, photographs are admissible “to show the manner of death, location of wounds, and the identity of the victim.” Larkins v. State, 655 So.2d 95, 98 (Fla.1995). On the other hand, trial courts must be cautious in not permitting unduly prejudicial or particularly inflam *199 matory photographs before the jury. However, a trial court’s decision to admit photographic evidence will not be disturbed absent an abuse of discretion. See Mansfield, 758 So.2d at 648.
Brooks v. State, 787 So.2d 765, 781 (Fla.2001).
Further, “[t]he mere fact that photographs may be gruesome does not necessarily mean they are inadmissible. The admission of such photographs is within the trial court’s discretion and will only be reversed when an abuse of discretion has been demonstrated.” Harris, 843 So.2d at 864 (citing Rose v. State, 787 So.2d 786 (Fla.2001)); see also Gorby v. State, 630 So.2d 544, 547 (Fla.1993) (finding that trial court did not abuse its discretion in admitting numerous photographs and a videotape of the crime scene where “[t]he court conscientiously considered all of the photos the state sought to introduce and rejected those it found to be too prejudicial or cumulative”). To be relevant, however, “a photo of a deceased victim must be probative of an issue that is in dispute.” Almeida, 748 So.2d at 929.
In this case, the photographs to which Ault objects were offered into evidence during the testimony of Dr. Lance Davis, the medical examiner who conducted the victims’ autopsies. These photographs were labeled State’s Exhibits 27, 28, 29, and 30. Exhibits 27 through 29 were taken during the autopsy of Deanne Mu’min. Exhibit 27 depicted a child with a bloated face, and Exhibits 28 and 29 depicted the victim’s vaginal area. When the State sought to introduce these photos, the jury was excused from the room and the judge questioned Dr. Davis regarding the relevance of these photos to his testimony. Regarding the first photo, Dr. Davis explained that the disproportionate bloating in the victim’s head provided evidence of strangulation. Exhibits 28 and 29 provided evidence of vaginal trauma. Defense counsel objected, arguing that the photographs were irrelevant to any material ■issue and were unduly prejudicial. The judge admitted the photos, finding them relevant to the issues in the case and specifically noting that he believed their probative value outweighed their prejudicial effect.
The State next presented three photos identified as Exhibits D-l, E-l, and F-l. Defense counsel again objected based on prejudice. Regarding each photo’s purpose, the State explained that F-l depicted a white foam coming out of one victim’s mouth, which was evidence that she was alive when placed in the attic, and that there was a difference of twelve to eighteen hours between the times of death of the two girls. E-l depicted bruise marks on a victim’s neck. D-l depicted Alicia Jones on her back, showing discoloration in different areas of her body. The court admitted E-l as State’s Exhibit 30, but excluded the other two photos. Subsequently, the photos were admitted during Dr. Davis’s testimony. Dr. Davis described the evidence of manual strangulation, as well as the effects of strangulation on the victims, and discussed evidence of vaginal trauma and hemorrhaging depicted in State’s Exhibit 29. He stated that in State’s Exhibit 27, Deanne Mu’min’s shorts appeared to be buttoned incorrectly. He also noted his conclusion that Alicia Jones survived approximately eighteen hours longer than her sister and that her clothes were undisturbed.
In McWatters v. State, 36 So.3d 613, 637 (Fla.), petition for cert. filed, No. 10-6029 (U.S. Aug. 20, 2010), we found that the trial court did not abuse its discretion in admitting four autopsy photographs into evidence, explaining, “This Court has upheld the admission of photographs when they are offered to explain a medical ex *200 aminer’s testimony, the manner of death, the location of the wounds, or to demonstrate the heinous, atrocious, or cruel (HAC) factor.” Although the photographs in McWatters depicted the decomposed heads, necks, and upper torsos of the victims, they were relevant where used by the medical examiner to explain the condition of the bodies and the manner and cause of death. Additionally, we found that “[t]he photographs were also relevant to establishing HAC because [the medical examiner] used these photographs to demonstrate how the victims were strangled.” Id.; see also England v. State, 940 So.2d 389, 399 (Fla.2006) (finding that the trial court did not abuse its discretion in admitting autopsy photos of the victim’s head, torso, and hands in a moderately decomposed state where relevant to establish the manner and cause of death and HAC).
Here, the trial court evaluated each photo to determine whether it was relevant to prove an aggravating circumstance. The court “conscientiously considered all of the photos the state sought to introduce and rejected those it found to be too prejudicial or cumulative.” Gorby, 630 So.2d at 547. The photographs were used by the medical examiner to explain his conclusions regarding the circumstances of the victims’ deaths. See McWatters, 36 So.3d at 637. Accordingly, we find that the trial court did not abuse its discretion in admitting the four photographs.
Weight Given to Jury Verdict
Ault challenges the portion of the trial court’s sentencing order in which it stated that it gave great weight to the sentencing recommendation provided by the jury, pursuant to Tedder v. State, 322 So.2d 908 (Fla.1975). We held in Tedder that “[a] jury recommendation under our trifurcated death penalty statute should be given great weight.” Id. at 910. Ault contends that Tedder was overruled by Ross v. State, 386 So.2d 1191, 1197 (Fla.1980), in which this Court rejected a trial court’s decision to sentence the defendant to death, holding that the trial court had given undue weight to the jury’s verdict. However, we find that the trial court in this case applied the correct standard:
In Florida, the sentencing scheme requires that, first, the jury weigh the aggravating and mitigating factors and recommend to the court, by a majority vote, whether life or death is the appropriate sentence. Next, the court must independently consider the aggravating and mitigating circumstances and reach its decision on the appropriate penalty, giving great weight to the jury’s advisory sentence. Tedder v. State, 322 So.2d 908 (Fla.1975).
State v. Coney, 845 So.2d 120, 131 (Fla.2003) (quoting trial court’s order). This standard applies to recommendations of death as well as to recommendations of life in prison. See, e.g., Blackwood v. State, 946 So.2d 960, 975 (Fla.2006). Contrary to Ault’s assertions, we did not overrule the great weight standard in Ross. Instead, we found that the trial court applied Ted-der incorrectly by summarily following the jury’s recommendation without reaching its own independent judgment as to the appropriate sentence. See Ross, 386 So.2d at 1197-98. Because the trial court assigned the correct weight to the jury’s verdict in this case, we reject Ault’s claim of error.
Presentencing Investigation Report
During the Spencer[11] hearing, Ault’s counsel requested the preparation of a presentencing investigation report (PSI), which the trial judge denied. Ault argues that he was entitled to a PSI pursuant to *201 Muhammad v. State, 782 So.2d 343, 363 (Fla.2001), and Florida Rule of Criminal Procedure 3.710. Under rule 3.710(b), “[s]hould a defendant in a capital case choose not to challenge the death penalty and refuse to present mitigation evidence, the court shall refer the case to the Department of Corrections for the preparation of a presentence report.”
In Muhammad, the defendant discharged his penalty phase counsel during jury selection and subsequently refused to present any mitigating evidence during the penalty phase. The jury, after hearing only the State’s evidence, recommended death. The trial judge followed the jury’s recommendation. See Muhammad, 782 So.2d at 350-51. On direct appeal, we vacated Muhammad’s death sentence and remanded for resentencing. However, concerned that Muhammad might again refuse to present mitigation evidence during the new sentencing proceedings, we considered “what prospective procedures should apply on resentencing.” Id. at 363. We stated as follows:
In the past, we have encouraged trial courts to order the preparation of a PSI to determine the existence of mitigating circumstances “in at least those cases in which the defendant essentially is not challenging the imposition of the death penalty.” Farr v. State, 656 So.2d 448, 450 (Fla.1995) (“Farr II”); see Allen v. State, 662 So.2d 323, 330 (Fla.1995). Having continued to struggle with how to ensure reliability, fairness, and uniformity in the imposition of the death penalty in these rare cases where the defendant waives mitigation, we have now concluded that the better policy will be to require the preparation of a PSI in every case where the defendant is not challenging the imposition of the death penalty and refuses to present mitigation evidence.
Id. (emphasis added).
A PSI was not required in this case. Unlike Muhammad, Ault was represented by counsel, challenged the imposition of the death penalty, and presented mitigating evidence during the penalty phase.[12] Accordingly, while the trial court had the option of ordering a PSI under rule 3.710(a) (“In all cases in which the court has discretion as to what sentence may be imposed, the court may refer the case to the Department of Corrections for investigation and recommendation.”), nothing in Muhammad or in rule 3.710(b) required it to do so. Ault’s counsel in fact acknowledged at the Spencer hearing that a PSI was not required. We affirm the trial court’s decision.
Exclusion from Pretrial Conference
Next, we address Ault’s claim that he was improperly excluded from a pretrial conference. Under Florida Rule of Criminal Procedure 3.180(a)(3), a criminal defendant has the right to be present “at any pretrial conference, unless waived by the defendant in writing.” Ault argues that at a pretrial status hearing, defense counsel spoke with the trial judge outside of Ault’s presence and gave the judge negative information about Ault’s case. Neither party asserts that Ault waived his right to be present. However, we need not address the propriety of the meeting because we conclude that any error was harmless. See Pomeranz v. State, 703 So.2d 465, 471 (Fla.1997).
*202 The conversation to which Ault objects occurred following a status hearing on September 27, 2005. At the previous hearing, held on August 17, 2005, the trial court addressed a motion to dismiss counsel filed by Ault, and a motion to withdraw filed by Ault’s attorney. After discussing the allegations raised in the motion to dismiss, which concerned defense counsel’s failure to deliver certain medical records to the defendant, Ault informed the court that he had filed a nine-page complaint against defense counsel with The Florida Bar. On the court’s inquiry, defense counsel explained that the Bar complaint concerned the same issues that had been raised in Ault’s motion to dismiss counsel. After additional discussion, the court denied both motions.
At the next status hearing, held on September 27, 2005, defense counsel’s delivery of documents to Ault was again discussed. Ault again mentioned the Bar complaint and expressed the opinion that counsel had lied to the Bar in his response. After the hearing, defense counsel met with the judge outside of Ault’s presence. Referring back to his motion to withdraw, counsel stated that he was concerned about the Bar complaint, specifically that certain allegations made therein might force him to divulge privileged information, and that any such information could be obtained by the State. Counsel also stated that Ault had filed a federal civil rights lawsuit in which defense counsel and the prosecutor were both named. The judge responded that he would not address the matter until it became an issue in the case, and that whether it was appropriate for counsel to withdraw would depend on the nature of the complaint.
Regardless of whether the discussion qualifies as a pretrial conference under rule 3.180, errors of this kind are subject to reversal only if “fundamental fairness is thwarted.” Kearse, 770 So.2d at 1124 (quoting Pomeranz, 703 So.2d at 471). We have rejected claims of error under rule 3.810(a) where a defendant has not suffered any prejudice from his or her absence from a pretrial conference. See, e.g., Pomeranz, 703 So.2d at 471. We have also held a defendant’s absence to be harmless where no adverse rulings were made outside the defendant’s presence, and where the defendant would not have been able to assist his counsel in opposing adverse rulings. See Roberts v. State, 510 So.2d 885, 890-91 (Fla.1987); Garcia v. State, 492 So.2d 360, 363 (Fla.1986).
Here, Ault did not suffer prejudice from the discussion outside his presence. See Pomeranz, 703 So.2d at 471. The information that Ault asserts was damaging was in fact discussed at the previous status hearing in Ault’s presence and was initially introduced by Ault himself. The only new information presented to the court was that Ault had subsequently filed a civil rights lawsuit in addition to the Bar complaint. However, the judge did not discuss with defense counsel any of the substantive claims made in either the lawsuit or the Bar complaint, and no rulings were made in Ault’s absence. Accordingly, we hold that any error in excluding Ault from this conversation was harmless.[13]
*203 Motion to Disqualify/Judicial Bias
We next address Ault’s claim that he was denied a fair hearing due to judicial bias. See Rose v. Clark, 478 U.S. 570, 577-78, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). Ault argues that Judge Marc Gold revealed his bias by (1) failing to reappoint the defense attorney from Ault’s first penalty phase; (2) discussing the case with defense counsel outside of Ault’s presence; and (3) refusing to order a PSI. In his Supplemental Initial Brief, Ault also argues that the trial court erred in rejecting his pro se motion to disqualify the judge. In that motion, Ault asserted that Judge Gold (1) made an open threat against him; (2) expressed a predisposition against him by stating that Ault would spend the rest of his life locked up; and (3) was forgetful or ill or both.
Addressing the motion to disqualify first, the trial court was correct as a matter of law in rejecting the motion. In Logan v. State, 846 So.2d 472 (Fla.2003), a criminal defendant challenged the trial court’s decision to deny both a pro se motion to dismiss the charges and a pro se motion for bond reduction after the defendant’s counsel refused to adopt the motions. We explained that the Sixth Amendment does not “guarantee that the accused can make his own defense personally and have the assistance of counsel.” Id. at 474 (quoting State v. Tait, 387 So.2d 338, 339-40 (Fla.1980)). We also cited with approval a statement by the Fifth District Court of Appeal that “[t]he defendant, under appropriate circumstances, has the constitutional right to waive counsel and represent himself. The defendant has no right, however, to partially represent himself and, at the same time, be partially represented by counsel.” Id. at 475 (quoting Sheppard v. State, 391 So.2d 346, 347 (Fla. 5th DCA 1980)). With the exception of a defendant’s pro se motion to discharge his or her court-appointed attorney, any pro se pleading that is not adopted by the defendant’s counsel is unauthorized and a nullity. See id. at 475-76; but see Knarich v. State 866 So.2d 165, 167 (Fla. 2d DCA 2004) (noting that where counsel refused to endorse a pro se motion to disqualify the judge, the trial court permitted defendant to act as co-counsel for purposes of the motion); Turner v. State, 598 So.2d 186, 186 (Fla. 1st DCA 1992) (“Although the appellant had appointed counsel, his motion to disqualify the trial judge was filed pro se. In the motion, he requested permission to serve as his own co-counsel for purposes of the motion. By entertaining the motion on the merits, the judge implicitly granted this request.”).[14] In this *204 case, the trial court asked defense counsel whether he was adopting Ault’s pro se motion to disqualify. Counsel responded in the negative and the court struck the motion as a nullity. Under Logan, this ruling was correct as a matter of law, and we find no abuse of discretion in failing to consider the motion.
Regarding Ault’s general claim of judicial bias, we find that this claim is unpreserved for appellate review. Under Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982), “in order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.” In Overton v. State, 976 So.2d 536, 547 (Fla.2007), for example, we rejected an appellant’s claim that he was denied a full and fair evidentiary hearing due to improper conduct by the trial judge where there was “no indication in the record that Overton ever objected or attempted to disqualify Judge Jones due to his alleged improper conduct.” In the present case, Ault never filed a valid motion to disqualify the judge. The only motion to disqualify was correctly treated as a nullity. See Logan, 846 So.2d at 475-76. Further, none of the present grounds for disqualification were asserted in that motion. Accordingly, the specific contentions supporting disqualification were not asserted in the court below. Ault is therefore barred from raising these claims on appeal. See Steinhorst, 412 So.2d at 338.
Finally, we note that, even if Ault’s claim were not procedurally barred, the grounds asserted here are insufficient to establish a valid claim of judicial bias. In order to present a facially sufficient basis for disqualification, a party must demonstrate a well-grounded fear that he will not receive a fair trial. See Mansfield v. State, 911 So.2d 1160, 1170 (Fla.2005). A mere subjective fear of bias is legally insufficient. “[R]ather, the fear must be objectively reasonable.” Id. at 1171 (quoting Arbelaez v. State, 898 So.2d 25, 41 (Fla.2005)). As we explained in Rivera v. State, 717 So.2d 477 (Fla.1998):
The fact that the judge has made adverse rulings in the past against the defendant, or that the judge has previously heard the evidence, or “allegations that the trial judge had formed a fixed opinion of the defendant’s guilt, even where it is alleged that the judge discussed his opinion with others,” are generally considered legally insufficient reasons to warrant the judge’s disqualification.
Id. at 481 (quoting Jackson v. State, 599 So.2d 103, 107 (Fla.1992)). Here, Ault asserts that judicial bias was demonstrated through two adverse rulings and because the judge had discussed potentially negative information with defense counsel. Ault has not presented factual grounds establishing a reasonable fear of judicial bias.
*205 Motion for Self-Representation
Next, Ault argues that his Sixth Amendment right to self-representation was violated when the trial court improperly denied his motion to proceed pro se without first conducting a hearing to determine whether Ault’s decision was knowing and intelligent and made of Ault’s own free will. See Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); State v. Bowen, 698 So.2d 248, 250 (Fla.1997). “Faretta inquiries are required where a defendant has made an unequivocal request for self-representation.” State v. Roberts, 677 So.2d 264, 265 (Fla.1996). In this case, however, the record demonstrates that Ault did not make such a request.
Ault initially filed two pro se motions to proceed pro se with appointment of standby counsel, the first on April 19, 2007, and the second on May 16, 2007. On May 24, 2007, Ault filed a pro se motion requesting that the court dismiss his current counsel and appoint a new attorney to represent him. The court reviewed these motions on June 4, 2007. The court first evaluated the claims raised in Ault’s May 24 motion to dismiss counsel. It determined that counsel was not deficient and denied the motion.[15] The judge then asked Ault whether he wished to represent himself. Ault equivocated and, after additional discussion, indicated to the judge that he intended to withdraw his motion for self-representation when he filed the later motion to dismiss counsel. The court then asked whether there were any other matters that Ault wished to discuss, and Ault responded in the negative. Because the record demonstrates that Ault did not make an unequivocal request for self-representation, we find that the trial court did not err in failing to conduct a Faretta inquiry.
Constitutionality of Florida’s Capital Sentencing Scheme
Finally, we address Ault’s challenges to the constitutionality of Florida’s capital sentencing protocols. Ault raises several claims under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). We find each claim to be without merit.
In Ring, 536 U.S. at 609, 122 S.Ct. 2428, the United States Supreme Court held that in capital sentencing schemes in which aggravating factors operate as the functional equivalent of elements of a greater offense, the Sixth Amendment requires that each aggravator must be found by a jury. Under Florida law, in order to return an advisory sentence in favor of death a majority of the jury must find beyond a reasonable doubt the existence of at least one aggravating circumstance listed in the capital sentencing statute. See State v. Steele, 921 So.2d 538, 540 (Fla.2005) (citing § 921.141(2)(a), Fla. Stat. (2004)). The jury must also find that any aggravating circumstances outweigh any mitigating circumstances. See id. (citing § 921.141(2)(b), Fla. Stat. (2004)). While the jury’s advisory sentence need not be unanimous, a majority vote is necessary for a death recommendation. See id. at 545 (citing Fla. Std. Jury Instr. (Crim.) 7.11, at 132-33). Ault argues that under Ring, Florida’s capital sentencing scheme is unconstitutional for (1) failing to require a unanimous jury verdict in favor of death, (2) failing to require a unanimous jury finding of at least one aggravating circum *206 stance, and (3) failing to require that the jury find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances.
As to Ault’s first argument — that Florida’s death penalty is unconstitutional for failing to require a unanimous recommendation in favor of death — this Court has repeatedly and continually rejected such claims. See Coday, 946 So.2d at 1006 (“This Court has repeatedly held that it is not unconstitutional for a jury to be allowed to recommend death on a simple majority vote.”); Whitfield v. State, 706 So.2d 1 (Fla.1997).
Regarding Ault’s second claim, an analysis of this argument is unnecessary where the death sentence is based on aggravating circumstances established by facts that have already been found by a unanimous jury. See Robinson v. State, 865 So.2d 1259, 1266 (Fla.2004). In Jones v. State, 845 So.2d 55, 74 (Fla.2003), we rejected a Ring claim where two of the aggravating circumstances were, first, that the defendant had been convicted of a prior violent felony and, second, that the murder was convicted while the defendant was engaged in the commission of a robbery and burglary, both of which were charged in the indictment and found unanimously by the jury at the end of the guilt phase of trial. See also Davis v. State, 2 So.3d at 966 (rejecting Ring claim where “prior violent felony” aggravator was based on contemporaneous convictions for murder, and “murder in the course of a felony” aggravator was based on felony murder conviction); Frances v. State, 970 So.2d 806, 822 (Fla.2007) (denying relief where “prior violent felony” aggravator was based on contemporaneous convictions for murder and robbery). Here, several of Ault’s aggravating circumstances were established by prior and contemporaneous convictions. Sexual battery, aggravated child abuse, and kidnapping were all found by a unanimous jury following the guilt phase of Ault’s trial. Ault’s contemporaneous convictions for first-degree murder established that Ault was convicted of another capital felony.
Further, we note that we have repeatedly rejected constitutional challenges to Florida’s death penalty under Ring. See, e.g., Jones, 845 So.2d at 74 (rejecting claim that Florida’s death penalty is unconstitutional under Ring); see also Bottoson v. Moore, 833 So.2d 693 (Fla.2002) (noting that the United States Supreme Court did not direct the Florida Supreme Court to reconsider the defendant’s death sentence in light of Ring); King v. Moore, 831 So.2d 143 (Fla.2002) (same). We have also directly rejected the claim that Ring requires the jury to find specific aggravating circumstances. See Steele, 921 So.2d at 544-48.
As to Ault’s third argument — that Florida’s death penalty is unconstitutional for failing to require the jury to find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt — we rejected a similar claim in Williams v. State, 967 So.2d 735 (Fla.2007). In that case, we determined that a jury did not have to be instructed that it was required to balance aggravating and mitigating circumstances using a “reasonable doubt” standard. Id. at 760-61. Ault points out that at least two states have imposed a reasonable doubt standard on a capital jury’s weighing of aggravating and mitigating circumstances. See State v. Rizzo, 266 Conn. 171, 833 A.2d 363, 407 (2003); State v. Wood, 648 P.2d 71, 83-84 (Utah), cert. denied, 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982). However, while the cited cases provide reasons why such a rule might be desirable, Ault has not cited any case which stands for the proposition that a reasonable doubt stan *207 dard is constitutionally required. Accordingly, we decline to overrule our previous holding in Williams.
Ault argues that he was sentenced in violation of Caldwell v. Mississippi, 472 U.S. at 320, 105 S.Ct. 2633, because the trial court informed the jury that its sentence was advisory and that the court would be making the ultimate sentencing decision. This Court “has consistently rejected Caldwell challenges to the standard penalty-phase jury instructions.” McKenzie v. State, 29 So.3d 272, 288 (Fla.2010), petition for cert. filed, No. 09-10878 (U.S. May 14, 2010). As we have explained, “Florida’s standard jury instructions fully advise the jury of the importance of its role and do not violate Caldwell.” Sochor v. State, 619 So.2d 285, 291 (Fla.1993) (citing Combs v. State, 525 So.2d 853 (Fla.1988)).
CONCLUSION
For the reasons expressed above, we reject each claim of error as either merit-less, harmless, or procedurally barred and affirm Ault’s sentences of death.
It is so ordered.
LEWIS, LABARGA, and PERRY, JJ„ concur.
CANADY, C.J., and POLSTON, J., concur in result.
QUINCE, J., dissents with an opinion, in which PARIENTE, J., concurs.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The trial court weighed this circumstance and the aggravated child abuse circumstance *186 as a single aggravator, in accordance with our decision in Lukehart v. State, 776 So.2d 906, 925 (Fla.2000) (holding that to weigh "aggravated child abuse” as a separate aggra-vator from a minor victim's age would constitute improper doubling).

. In considering this claim, the court consolidated twelve of the twenty-seven nonstatutory mitigators presented by Ault. The proposed mitigating circumstances considered together under the dysfunctional family factor were: (1) Ault was raised in a dysfunctional family; (2) Ault has an eighth grade education; (3) Ault attempted suicide when he was fourteen years old; (4) as a child, Ault was sexually abused, molested, and raped by his older brother, Charles; (5) Ault’s parents, though aware of the sexual abuse, did nothing to prevent further abuse; (6) Ault’s older brother, Charles, put a gun to Ault’s head to force sexual relations; (7) throughout childhood, Ault suffered a number of head injuries that were not properly treated because of the lack of health insurance; (8) Ault was raised in an unstable environment, having to constantly move and start at new schools; (9) Ault’s primary school report cards demonstrate poor academic performance, learning disabilities, and behavioral problems; (10) Ault was not nurtured as a child; (11) Ault was raised without strong family bonds; (12) Ault did not receive counseling as a child for his behavior, traumatic events, or academic development.

. The trial court also rejected Ault’s age as a statutory mitigating circumstance. The court concluded that since Ault was 30 years old at the time of his offenses, married, working, and a father, his age was not mitigating in relation to his offenses. Ault has not challenged this ruling on appeal.

. Notably, pedophilia was given "some weight” as a nonstatutory mitigator in the trial court’s previous sentencing order, which was vacated by this Court on other grounds. See Ault, 866 So.2d at 678-79.

. In that case the trial court found as statutory mitigation that the defendant had acted under the influence of an extreme mental or emotional disturbance, that his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, and that he was 69 years old at the time of the offense; and as nonstatutory mitigation that the defendant's prior crime had been committed 18 years before, his intent to kill was formed during a disagreement with the victim, his only arrest since his parole release in 1987 was for petit theft, he was under the influence of alcohol and medication at the time of his offense, he suffered from alcoholism and mild dementia, he had attempted suicide, he had served honorably in the military, and he had been a model prisoner during his previous incarceration in California. See Singleton, 783 So.2d at 972-73.

. We however must reiterate to trial judges that we expect an analysis and evaluation of every mitigating factor offered by the defendant. The analysis should also include a determination of the weight to be given if the factor is found to be mitigating.

. As nonstatutory mitigation, the trial court found that
Davis was capable of accepting responsibility for his actions and had shown remorse for his conduct and offered to plead guilty; that he had exhibited good behavior while in jail and prison; that he had demonstrated positive courtroom behavior; that he was capable of forming positive relationships with family members and others; that he had no history of violence in any of his past criminal activity; that he did not plan to kill or sexually assault the victim when he began his criminal conduct; that he cooperated with police, confessed his involvement in the crime, did not resist arrest, and did not try to flee or escape; that he had always confessed to crimes for which he had been arrested in the past, accepted responsibility, and pled guilty; that he had suffered from the effects of being placed in institutional settings at an early age and spending a significant portion of his life in such settings; and that Davis obtained his GED while in prison and participated in other self-improvement programs.
Davis, 698 So.2d at 1187.

. The nonstatutory mitigators were:
(1) Smithers was a good husband and father, (2) Smithers enjoyed a close relationship with his siblings, (3) Smithers was physically and emotionally abused by his mother as a child, (4) Smithers regularly attended church and was devoted religiously, (5) since being arrested, Smithers has been a model inmate and he would conduct himself appropriately in a prison setting, (6) Smithers has made several contributions to the community, and (7) Smithers confessed to the crime, but his trial testimony is in conflict with his statements to the detectives.
Smithers, 826 So.2d at 930.

. Ault bases his argument that his case is not among the least mitigated in part on our decision in Huckaby v. State, 343 So.2d 29 (Fla.1977). In Huckaby, the defendant was sentenced to death for capital sexual battery of a minor. Id. at 30. This Court reversed the death sentence after finding that the trial court had disregarded the defendant's substantial history of mental illness in failing to find any mitigation. We independently concluded that Huckaby qualified for both statutory mental health mitigators. Id. at 33-34. However, Huckaby was decided long before the decision of the United States Supreme Court in Kennedy v. Louisiana, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525, modified-U.S. -, 129 S.Ct. 1, 171 L.Ed.2d 932 (2008), and is distinguishable from the present case insofar as Huckaby had not committed and was not sentenced to death for murder. The present case is further distinguished from Huckaby due to our conclusion above that the trial court did not err in rejecting statutory mental health mitigation.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. At the end of the penalty phase, after the jury was instructed and sent to deliberate, Ault did write a letter to the judge requesting a waiver of the sentencing hearing and waiving his challenge to the death penalty. However, after some discussion between the court, counsel, and Ault himself as to whether Ault was receiving his medication, the court denied the request. Ault has not challenged this ruling on appeal.

. Ault asserts that in addition to violating rule 3.810(a), his absence from the September 27 conversation violated his due process right to be present at all "critical stages” of trial. See Muhammad, 782 So.2d at 351 (finding jury selection to be a critical stage of trial for which a defendant has a due process right to be present). Ault argues that in Rodgers v. State, 934 So.2d 1207, 1216 (Fla.2006), this Court found a due process right to be present during an in-chambers discussion between the two defense attorneys and the trial judge concerning counsels’ internal disagreement over the cross-examination of defense wit *203 nesses. However, Rodgers held only that the defendant's claim was meritless where he had specifically agreed to wait outside the judge’s chambers, waiving any right to be present; we did not address whether that meeting in fact qualified as a critical stage of trial. See id. In this case, we find that the conversation between the judge and the defense attorney was not a "critical stage of the proceedings requiring the defendant’s presence” for the purposes of due process. See Muhammad, 782 So.2d at 351.

. Ault does not disagree with this point of law, but instead argues that an additional exception should be created for pro se motions to disqualify the judge. Ault asserts that there is no reason to treat a motion to disqualify a judge differently from a motion to dismiss counsel. However, in Logan, this Court cited with approval the reasoning of the Fourth District Court of Appeal in Graves v. State, 642 So.2d 142, 143-44 (Fla. 4th DCA 1994), which found that an exception to the nullity rule was necessary to effectuate the requirement of Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973), that the trial court conduct an immediate inquiry into any motion to discharge court-appointed counsel. See Logan, 846 So.2d at 476. Additionally, the Fourth District explained:
[I]f the claim is that the appointed lawyer is not doing the lawyer’s assigned job, one *204 might wonder how that failure would ever come to light and be appropriately remedied if the person who is suffering from this inadequacy is not permitted to do so. Simply ignoring a pretrial assertion of ineffectiveness of counsel means that the claim is left to be taken up in post conviction relief proceedings.
Graves, 642 So.2d at 144.
We do not believe this reasoning extends to a motion to disqualify. Unlike a motion to dismiss counsel, the effectiveness of the defendant’s court-appointed attorney is not at issue, and the attorney has no incentive to refrain from adopting his client's motion if that claim has any merit. If counsel chooses not to adopt the pro se motion, the defendant may opt to represent himself and file the motion to disqualify at that time. See Logan, 846 So.2d at 475.

. See Nelson, 274 So.2d at 258-59 (holding that when a defendant raises a claim of ineffective assistance of counsel, the trial judge must conduct an inquiry into the claim), approved of in Hardwick v. State, 521 So.2d 1071, 1074-75 (Fla.1988).